STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. R.G.D.,
DEFENDANT-RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. W.T.P.,
DEFENDANT-RESPONDENT.

Argued October 21, 1986—Decided June 29, 1987.

1

*Kathleen A. Berkheiser,* Assistant Prosecutor, argued the cause for appellant (*Steven S. Neder,* Cumberland County Prosecutor, attorney).

*John Morelli* argued the cause for respondent R.G.D. (*Console, Marmero, LiVolsi, Wood, Curcio & Morelli,* attorneys).

*Robert S. Greenberg* argued the cause for respondent W.T.P. (*Schulman & Greenberg,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

I.

This appeal concerns the standards for waiver of juvenile offenders to adult court under the new Code of Juvenile Justice, *N.J.S.A.* 2A:4A–26, *L.*1982, *c.* 77, § 7, effective December 31, 1983.

The case stems from an incident that occurred on April 26, 1984, at the Vineland High School auditorium among R.G.D. and W.T.P., two juvenile boys ages sixteen and fifteen respectively, and the victim, A.A., a sixteen-year-old girl. All were students at the high school. Based on a police investigation, the State is prepared to show that it has probable cause to believe that the following acts occurred.

The victim, A.A., had agreed to skip a class and to meet the juvenile R.G.D. at the auditorium for the purpose of talking. When the victim arrived, however, R.G.D. was accompanied by W.T.P. The two boys then made sexual advances upon A.A. She fended off the advances, but stayed in the auditorium with the boys, apparently believing that she could control any situation that might arise. When they heard voices, the three moved to a more secluded area of the auditorium in order to avoid detection, fearing school disciplinary action if discovered skipping class. A.A. was then thrown to the floor and subjected to criminal sexual contacts by both boys. The offenses were exacerbated by the two boys exchanging positions and repeating the acts. Throughout the encounter the victim struggled to escape, but could not, yet was too frightened to scream during the attacks.

All three left the auditorium. A short while later, two students found the victim wandering through the hallway, disoriented, crying, and her blouse torn. The two students notified school authorities who called the police.

On April 27, 1984, juvenile delinquency complaints were filed against R.G.D. and W.T.P. charging them with conduct that if

committed by an adult would constitute acts of aggravated sexual assault in violation of *N.J.S.A.* 2C:14–2a(5)(a), a first-degree crime because the actor was aided or abetted in committing a sexual assault while using physical force. On May 22, 1984, the State filed a motion, pursuant to *N.J.S.A.* 2A:4A–26, seeking waiver of both cases from the Superior Court, Chancery Division, Family Part, to the Superior Court, Law Division (adult court). After the Family Part waived jurisdiction, the Appellate Division granted the juveniles' motions for leave to appeal. The Appellate Division reversed the transfer orders and remanded the cases for disposition in the juvenile court. It concluded that the trial court's rejection of expert testimony that R.G.D. could in all probability be rehabilitated before age nineteen was improper and that its failure to appoint an independent medical expert for W.T.P. was a denial of due process. 208 *N.J.Super.* 385 (1986). We granted the State's motion for leave to appeal. 104 *N.J.* 399 (1986).

The Family Part is the court that handles juvenile matters after *N.J. Const.* (1947), article VI, § 6 and *N.J.S.A.* 2A:4–3a to –3e, *L.*1983, *c.* 405, merged the functions of the former Juvenile and Domestic Relations Court into a court of general jurisdiction. Reference in the opinion to current and former courts exercising jurisdiction in juvenile matters as juvenile court or family court shall be intended to refer to the court that is now the Superior Court, Chancery Division, Family Part.

## II.

All agree that "the waiver of jurisdiction [by the Family Part] is a 'critically important' action determining vitally important statutory rights of the juvenile." *State in the Interest of R.L.,* 202 *N.J.Super.* 410, 412 (App.Div.), *certif. denied,* 102 *N.J.* 357 (1985) (quoting *Kent v. United States,* 383 *U.S.* 541, 556, 86 *S.Ct.* 1045, 1054–55, 16 *L.Ed.*2d 84, 94 (1966)). In the opinion of one commentator, "waiver to the adult court is the single most serious act that the juvenile court can perform." P. Hahn, *The*

*Juvenile Offender and the Law* 180 (3rd ed. 1984). This is because once waiver of jurisdiction occurs, the child loses all the protective and rehabilitative possibilities available to the Family Part. *Id.* at 178.

So important is the decision that the United States Supreme Court has invested it with constitutional significance that requires "procedural regularity sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness, as well as compliance with the statutory requirement[s]." 383 *U.S.* at 553, 86 *S.Ct.* at 1053, 16 *L.Ed.*2d at 93.

Implicit in the concept of procedural regularity is the requirement for standards. What particularly troubled the Supreme Court in the *Kent* case was the standardless discretion by which waiver decisions were made under District of Columbia law. *Id.* at 553–54, 560–62, 86 *S.Ct.* at 1053–54, 1056–58, 16 *L.Ed.*2d at 93, 97–98. Hence, the Court insisted, as a minimum, on the procedural regularities it outlined. In an appendix to the opinion, the *Kent* Court set forth a series of criteria, proposed by a judge of the Juvenile Court of the District of Columbia, as exemplars of sound criteria for decision. *Id.* at 565–68, 86 *S.Ct.* at 1059–60, 16 *L.Ed.*2d at 99–101.

"Drawing lines [for transfer] is difficult and necessarily arbitrary. The line between 'adult' and 'child' is important in every context, but nowhere more than in the application of the criminal law." Institute of Judicial Administration, American Bar Association, *Juvenile Justice Standards: Standards Relating to Transfer Between Courts* 1 (1980). The sobering effects of experience on "the high hopes and aspirations of * * * supporters of the juvenile court concept" are directly reflected in the changing standards for waiver of juveniles to adult court. *McKeiver v. Pennsylvania,* 403 *U.S.* 528, 534, 91 *S.Ct* 1976, 1980–81, 29 *L.Ed.*2d 647, 654 (1971).

In a long footnote, the Court in *McKeiver* outlined the discrepancy between theory and practice that emerged as juvenile justice developed. *Id.* at 544 n. 5, 91 *S.Ct.* at 1986 n. 5, 29

*L.Ed.*2d at 660 n. 5. "In theory the juvenile court was to be helpful and rehabilitative rather than punitive," concentrating in each case the best of current resources to the reclamation of youth, *ibid,* affixing no stigmatizing label upon the juveniles and exercising " 'its protective powers to bring the errant child back into the fold.' " *Ibid* (quoting the President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Juvenile Delinquency and Youth Crime,* 9 (1967)).

What actually emerged was that, because of the absence of facilities and personnel and the limits of knowledge and techniques, there was increasing reason to believe that the court's intervention was more of an exercise of acting in the community's interest than in the child's interest and that there was increasing concern that its intervention merely reinforced the juvenile's unlawful impulses. *Id.* at 544 n. 5, 91 *S.Ct.* at 1986 n. 5, 29 *L.Ed.*2d at 660 n. 5.

The legislative evolution of New Jersey's transfer provisions mirrored those shifting perceptions. The early provisions of our Code of Juvenile Justice provided:

> If it shall appear to the satisfaction of the juvenile and domestic relations court that a case of juvenile delinquency as defined in section 2A:4–14 of this title committed by any juvenile of the age of 16 or 17 years, should not be dealt with by the court, either because of the fact that the person is an habitual offender, or has been charged with an offense of a heinous nature, under circumstances which may require the imposition of a sentence rather than the disposition permitted by this chapter for the welfare of society, then the court may refer such case to the county prosecutor of the county wherein the court is situate.
>
> Any juvenile of the age of 16 or 17 years may demand a presentment and trial by jury and, in such case, when this fact is made known to the court, such case, together with all documents pertaining thereto, shall be referred to the county prosecutor.
>
> Cases so referred to the county prosecutor shall thereafter be dealt with in exactly the same manner as a criminal case. [*N.J.S.A.* 2A:4–15, *repealed by L.* 1973, *c.* 306, § 27.]

The 1977 revision of *N.J.S.A.* 2A:4–48, *L.*1977, *c.* 364, § 2, the statute superseding *N.J.S.A.* 2A:4–15 and originally adopted by *L.*1973, *c.* 306, § 27, provided that the juvenile court could, without consent of the juvenile, waive a case to the adult court

if it found that (1) the juvenile was "14 years of age or older," (2) there was "probable cause to believe that the juvenile committed a delinquent act which would constitute homicide, treason if committed by an adult or committed an offense against the person in an aggressive, violent and willful manner," and (3) "adequate protection of the public require[d] waiver" and "that there [were] no reasonable prospects for rehabilitation of the juvenile prior to his attaining the age of majority by use of the procedures, services and facilities available to the court." Under that statutory scheme, nonwaiver was to be the rule and not the exception. "[T]he ordinarily anticipated situation is one of nonwaiver and waiver and transfer may be ordered only under a determination of certain fixed standards * * *." *State in the Interest of L.C.*, 184 *N.J.Super.* 569, 573 (App.Div.1982).

The key issues in the transfer were the protection of the public and rehabilitation of the offender. In *State in the Interest of C.A.H. and B.A.R.*, 89 *N.J.* 326, 333–34 (1982), we found that the juvenile court had incorrectly applied the standards under the statute by not properly considering the statutorily required protection of the public. Protection of the public is not limited to ensuring society's safety or physical security from the offender; rather, deterrence is a relevant factor in its objective of preventing future criminal conduct by both the juvenile and others. *Id.* at 334. Consequently, the discretion to be exercised by the juvenile court required it to balance the concerns for the "adequate protection of the public" against the "reasonable prospects for rehabilitation of the juvenile," *N.J. S.A.* 2A:4–48c. *Id.* at 338.

In the 1970s, a sweeping change in penal policy occurred [1] with respect to adult offenders concerning rehabilitation possibilities and objectives. "Central to the demise of the old

---

[1] These principles also reflected changing perceptions in the field of juvenile justice.

structure was the clinical evidence that the prevailing theory of rehabilitation simply did not work. These studies led irrevocably to the conclusion that the criminal justice system had no idea how to rehabilitate offenders and reduce recidivism." *State v. Roth*, 95 *N.J.* 334, 348 (1984). The consensus soon emerged among proponents of dispositional law reform that the theory of rehabilitation should be abandoned as a primary justification for the nature and length of sentences. These concerns were paralleled in the juvenile justice system. Public concern about unrehabilitated juvenile offenders stimulated a "just deserts" approach to juvenile crime. Zenoff, "Controlling the Dangers of Dangerousness: The ABA Standards and Beyond," 53 *Geo.Wash.L.Rev.* 562, 604 n. 251 (1985) (citing Zenoff & Zients, "Juvenile Murderers: Should The Punishment Fit The Crime?," 2 *Int'l J.L. & Psychiatry* 533, 536 (1980)). The national legislative response to this realization was a gradual departure from the traditional juvenile justice philosophy. *In re Seven Minors*, 99 *Nev.* 427, 432, 664 *P.2d* 947, 950 (1983).

The judicial departure was not far behind the legislative. Although juvenile courts may have difficulty at times in balancing the interests of the child and the public, there is no irreconcilable opposition between the two. By formally recognizing the legitimacy of punitive and deterrent sanctions for criminal offenses juvenile courts will be properly and somewhat belatedly expressing society's firm disapproval of juvenile crime and will be clearly issuing a threat of punishment for criminal acts to the juvenile population. [*Ibid.*]

Our own evolving policy similarly expressed concern that the juvenile justice system had dealt inadequately with serious offenders even as it may have dealt too severely with less serious offenders. The national concern for the inadequate treatment of the serious juvenile offender coalesced in New Jersey with much broader concerns about the development of a family court for the State to deal comprehensively with all classes of juvenile offenders.

At the same time the family court was being discussed, a movement was started by legislators, prosecutors, public defenders and child advocacy groups to reform the State's juvenile justice system. While many of these groups emphasize different problems, they agreed that [less serious] offenders were

being treated too harshly, and should be diverted from the justice system to receive the services they need to avoid the recidivism cycle. On the other hand, most of these people agreed that the system was treating the violent, repeat offender too leniently. [*Report of Family Court Committee to the June 23, 1983 Judicial Conference* ii (1983).]

This movement culminated on July 23, 1982, when Governor Kean signed Assembly Nos. 641–645, *L.*1982, *c.* 77–81 that replace various statutes relating to juvenile offenders. The Senate Judiciary Statement to Assembly No. 641, the New Jersey Code of Juvenile Justice ("Senate Judiciary Statement"), states:

This bill recognizes that the public welfare and the best interests of juveniles can be served most effectively through an approach which provides for harsher penalties for juveniles who commit serious acts or who are repetitive offenders, while broadening family responsibility and the use of alternative dispositions for juveniles committing less serious offenses. Moreover, the provisions of this bill and the other accompanying bills reflect a philosophy which is pragmatic and realistic in nature rather than bound to any particular ideology.

The goal of the new legislation in this regard was to deal more strictly with serious offenders. In keeping with that pragmatic philosophy, the newly revised Code contained, among many others, a change concerning the prosecutor's motion for referral of a case to adult court without the juvenile's consent. *N.J.S.A.* 2A:4A–26. The Act broadened the class of offenders eligible for waiver and revised the standards for waiver in certain cases. *Id.*

A very significant change in the waiver standard was made with respect to certain serious juvenile offenders. For this group, it was the Legislature's intention to shift the process toward waiver. The legislative statement to the Code of Juvenile Justice summarizes the specific changes made. In order to be eligible for waiver, the juvenile must be fourteen years of age or older at the time of the offense and it must be established that either (a) there is probable cause to believe that the juvenile committed certain serious acts such as criminal homicide, robbery, arson, sexual assault, possession of a firearm, (b) the juvenile had been previously adjudicated delinquent on the basis of a serious offense, or (c) the juvenile committed a

delinquent act as a previous offender and had been previously incarcerated or had committed the delinquent act in a violent manner against a person. "Senate Judiciary Statement," *supra*, § 7.[2]

---

[2]*N.J.S.A.* 2A:4A–26 provides:

a. On motion of the prosecutor, the court shall, without the consent of the juvenile, waive jurisdiction over a case and refer that case from the family court to the appropriate court and prosecuting authority having jurisdiction if it finds, after hearing, that:

(1) The juvenile was 14 years of age or older at the time of the charged delinquent act; and

(2) There is probable cause to believe that the juvenile committed a delinquent act or acts which if committed by an adult would constitute:

(a) Criminal homicide other than death by auto, robbery which would constitute a crime of the first degree, aggravated sexual assault, sexual assault, aggravated assault which would constitute a crime of the second degree, kidnapping or aggravated arson; or

(b) A crime committed at a time when the juvenile had previously been adjudicated delinquent, or convicted, on the basis of any of the offenses enumerated in subsection a.(2)(a); or

(c) A crime committed at a time when the juvenile had previously been sentenced and confined in an adult penal institution; or

(d) An offense against a person committed in an aggressive, violent and willful manner, other than an offense enumerated in subsection a.(2)(a) of this section, or the unlawful possession of a firearm, destructive device or other prohibited weapon, or arson; or

(e) A violation of section 19 of the "Controlled Dangerous Substances Act" (P.L.1970, c. 226; C. 24:21–19); or

(f) Crimes which are a part of a continuing criminal activity in concert with two or more persons and the circumstances of the crimes show the juvenile has knowingly devoted himself to criminal activity as a source of livelihood; or

(g) An attempt or conspiracy to commit any of the acts enumerated in paragraph (a), (d) or (e) of this subsection; and

(3) Except with respect to any of the acts enumerated in subsection a.(2)(a) of this section or any attempt or conspiracy to commit any of those acts, the State has shown that the nature and circumstances of the charge or the prior record of the juvenile are sufficiently serious that the interests of the public require waiver.

However, if in any case the juvenile can show that the probability of his rehabilitation by the use of the procedures, services and facilities available to the court prior to the juvenile reaching the age of 19 substantially outweighs the reasons for waiver, waiver shall not be granted.

Once it is established by the prosecution, however, that the act was one of the enumerated offenses, "no additional showing is required in order for waiver to occur." *Ibid.* Likelihood of "rehabilitation" was retained as a factor bearing upon waiver but was made substantially more difficult to establish. The juvenile has the burden of proof on this issue; and must show the probability that he can be rehabilitated as a juvenile prior to reaching the age of nineteen and, further, that the probability of such rehabilitation "substantially outweighs the reasons for the waiver." *N.J.S.A.* 2A:4A-26a(3); "Senate Judiciary Statement," *supra,* § 7; *see State in the Interest of S.M.,* 211 *N.J.Super.* 675 (App.Div.), *certif. den.,* — *N.J.* — (1986).

Under the statute, for the more serious offenders, the range of discretion within which the Family Part may make the waiver decision has been narrowed considerably. Juveniles charged with the crimes of murder, robbery, sexual assault and similar serious offenses set forth in *N.J.S.A.* 2A:4A-26 are the primary candidates for waiver to the adult courts.[3] The statute requires a court to balance the value of probable rehabilitation of the juvenile offender, if shown, against the general deterrent value of exposing the offender to the more severe sentences

---

b. In every case where there is a motion seeking waiver, the prosecutor shall within a reasonable time thereafter file a statement with the Attorney General setting forth the basis for the motion. In addition, the court shall, in writing, state its reasons for granting or denying the waiver motion. The Attorney General shall compile this information and report its findings to the Legislature 18 months after the effective date of this act with the objective of developing, where appropriate, guidelines as to the waiver of juveniles from the family court.

c. An order referring a case shall incorporate therein not only the alleged act or acts upon which the referral is premised, but also all other delinquent acts arising out of or related to the same transaction.

d. A motion seeking waiver shall be filed by the prosecutor within 30 days of receipt of the complaint. This time limit shall not, except for good cause shown, be extended.

[3]These offenders are referred to as "Chart 1" offenders in the Report of the Juvenile Delinquency Disposition Commission. *Infra* at 12 n. 5.

available to the adult court.[4]  Our courts have referred to the Act as creating a "presumption" in favor of waiver. *State in the Interest of A.B.*, 214 *N.J.Super.* 558 (App.Div.1987); *State in the Interest of S.M., supra,* 211 *N.J.Super.* 675.

The legislative preference or presumption in favor of waiver is clear from the evolution of the statute, as well as from its explicit provisions.  We note that an Assembly Committee Substitute for Assembly No. 3427 proposed by Assemblyman Herman merely required a juvenile charged with a so-called "Chart 1 Offense" to prove by a preponderance of the evidence that he or she could be rehabilitated before reaching the age of nineteen in order to avoid a presumption in favor of waiver.  If the juvenile met the burden of proof, the court had to determine if the reasons for waiver substantially outweighed the juvenile's probability for rehabilitation.  The Legislature reversed this balance and instead adopted *L.*1982, *c.* 77, § 7, which placed the heavy burden on the juvenile to overcome the presumption of waiver for "Chart 1 Offenses."  Hence, the Code evinces a conscious shift in creating the stronger presumption in favor of waiver and in placing the much heavier burden on the "Chart 1" offender.  While there is no judicial calculus that unerringly resolves each case, the process involves the familiar balance of factors that we described in *State in the Interest of C.A.H. and B.A.R., supra,* 89 *N.J.* 326.  The difference is that the "evidential axis" that we there described, *id.* 89 *N.J.* at 344, has been heavily tilted by the Legislature in favor of waiver.[5]

---

[4]As noted, the court must find that the probability of rehabilitation substantially outweighs the reasons for waiver, that is, deterrence, and it is the juvenile who has the burden of proof to demonstrate this.

[5]In revising the standards for waiver, the Legislature did not, however, clearly intend a wholesale shift of all juvenile offenders to adult court.  The Juvenile Delinquency Disposition Commission, in its first annual report, noted:

> Considerable controversy surrounded adoption of these new waiver guidelines.  Framers of the provision did not articulate intent that waivers should increase, but rather that the reasons waivers were requested or granted be more clearly articulated, thus requiring more prosecutorial and

In those cases in which the "evidential axis" nears balance, a useful reference may be consideration of proportionality, the concept that underlies our sentencing procedures. One of the key features of the Code of Juvenile Justice is the increased authority of the family court to order incarceration as an appropriate disposition for serious offenders, *N.J.S.A.* 2A:4A-43b, -44d, and in the case of habitual offenders, to add an extended term to any such disposition. *N.J.S.A.* 2A:4A-44d(3). Although not explicitly stated in *N.J.S.A.* 2A:4A-44, the "Senate Judiciary Statement," *supra,* § 25, stated that a policy of the Juvenile Code would be presumed imprisonment for certain serious crimes. "Since protection of the public is an obvious goal of the juvenile justice system, the public has a right to know that the system is protecting our society adequately." *State in the Interest of B.C.L.,* 82 *N.J.* 362, 378 (1980) (Pash-

---

judicial introspection. However, there was a general consensus that the new provisions would result in more juveniles being tried as adults, but there was little agreement as to how many would be waived. Some critics charged that changes would "open the floodgates" to juvenile waivers. This did not happen. ["The Impact of the New Jersey Code of Juvenile Justice," I *First Annual Report of the Juvenile Delinquency Disposition Commission* 37 (1986) (footnote omitted).]

In keeping with this goal, the Code of Juvenile Justice includes a requirement that all county prosecutors file a statement with the Attorney General setting forth the basis for waiver motions. *N.J.S.A.* 2A:4A-26b. The Attorney General then evaluates the information in order to assist the Legislature in "developing, where appropriate, guidelines as to the waiver of juveniles from the family court." *Ibid.* The report of the Attorney General pursuant to the Act confirms the perceptions of the Juvenile Delinquency Disposition Commission that prosecutors have not made a wholesale use of the waiver process. Juvenile Waivers to Adult Court: A Report to the New Jersey Legislature at 67 (Sept.1985) ("Report to the New Jersey State Legislature"). Rather, its use has been confined primarily to what the report refers to as "Chart 1 Offenses," the crimes of murder, robbery, sexual assault, and similar serious offenses set forth in *N.J.S.A.* 2A:4A-26. The report stated that "[c]ounty prosecutors utilized *N.J.S.A.* 2A:4A-26 for juvenile transfers in a very limited number of cases in spite of the fact that significantly more waivers could be sought given the stated criteria of the statute." "Report to the New Jersey State Legislature," *supra,* at vii. Undoubtedly, debate will continue on the efficacy of the new standards and the need for any mid-course corrections.

man, J.). Although in most cases the penal consequences of adult prosecution will be more severe than available under the Juvenile Code, there may be individual cases in which the likely penal options will not differ markedly; hence, reasons for waiver grounded on deterrence may not be as strong. A publicly articulated disposition, conscious of the necessity of informing the public that the period of incarceration ordered through the juvenile justice system will not be disproportionate to that expected in the adult court, may help effectuate the goal of assuring public confidence by imposing a proportionate sanction while also invoking the rehabilitative services available to the juvenile court.[6]

The juveniles in this case are charged with the first-degree offenses of aggravated sexual assault, "Chart 1 Offenses." Hence, we have focused our opinion on this kind of serious offense that has been specifically delineated for separate treatment under the Code of Criminal Justice. The decision to waive the less serious "Chart 2" offender entails the discretionary consideration of factors in addition to the offense itself. This waiver decision would follow the general standards outlined in *C.A.H. and B.A.R., supra,* 89 *N.J.* 326, and as now embraced in the statutory language of *N.J.S.A.* 2A:4A–26a(3). These standards require the State to show "that the nature and circum-

---

[6]Murder obviously presents the most difficult exercise for a court in the transfer decision because of the mandatory minimum requirement of thirty years imprisonment without possibility of parole if sentenced as an adult. *N.J.S.A.* 2C:11–3b. The maximum sentence for juvenile murder is twenty years, *N.J.S.A.* 2A:4A–44d(1)(a), with the possibility of a five-year extended term. *N.J.S.A.* 2A:4A–44d(3). By *N.J.S.A.* 2C:11–3g, *L.*1985, *c.* 478, § 1, the Legislature has determined that no juvenile shall be subject to capital punishment. Obviously, a 17½–year–old juvenile who commits murder, assuming he could demonstrate the probability of rehabilitation by the time he reaches age 19, would appear to receive a disproportionate sentence if the maximum exposure were twenty years with a possibility of parole in five years when contrasted with the thirty years of imprisonment without parole for one who is only six months older. On the other hand, the case of a juvenile barely over the age of fourteen years, in that nebulous man-child world, will cause us to ponder what is the proper balance of values.

stances of the charge or the prior record of the juvenile are sufficiently serious that the interests of the public require waiver," and the juvenile, then, to show the probability of rehabilitation prior to reaching age nineteen and that such probability substantially outweighs the reasons for waiver.

A word on the subject 'of appellate review. Here, as in other areas, the criminal justice system reposes this solemn responsibility in the sound discretion of the trial court. In the analogous transfer of jurisdiction to diversionary programs such as pretrial intervention or conditional discharge, the standard of review (with some variations) is whether the correct legal standard has been applied, whether inappropriate factors have been considered, and whether the exercise of discretion constituted a "clear error of judgment" in all of the circumstances. *State v. Humphreys*, 89 *N.J.* 4, 13 (1982) (citation omitted). The analysis evokes the three-part test of *State v. Roth, supra,* 95 *N.J.* at 363–64, that 1) findings of fact be grounded in competent, reasonably credible evidence, 2) correct legal principles be applied, and 3) the judicial power to modify a trial court's exercise of discretion will be applied only when there is a clear error of judgment that shocks the judicial conscience. The best measure of a waiver decision will be found in the court's statement of reasons. More is needed than the judge's individual call; specific factors must be delineated on the record. Once the particular standards legally applicable are followed and there is sufficient evidence in the record, the trial court decision should not be subjected to second-guessing in the appellate process. Here, as we noted in *Roth, supra,* we must be conscious of avoiding the possibility of public outrage being a determinative factor in a transfer decision or a sentencing disposition. 95 *N.J.* at 365.

### III.

We turn now to application of these principles to the facts of this case. Preliminarily, we note that it is clear to us that there

was sufficient evidence of probable cause to believe that these juveniles committed acts that would constitute the aggravated sexual assault, an offense described as a "Chart 1 Offense." Although the victim's version of the events was sharply contested by the juveniles and belied by some of the circumstances, the evaluation of probable cause is not an evaluation of guilt or innocence. That evidence must await the trial. *State in the Interest of B.T.*, 145 *N.J.Super.* 268, 273 (App.Div.1976), *certif. denied*, 73 *N.J.* 49 (1977); *cf. State v. Smith*, 92 *N.J.* 143 (1983) (evidence of guilt or innocence not dispositive of enrollment in pretrial intervention program). A juvenile may, however, "submit evidence at the waiver hearing that would minimize * * * involvement in the offense in order to enhance [the] chances of being found amenable to rehabilitation." *State in the Interest of G.W.*, 206 *N.J.Super.* 50, 58 (App.Div.), *certif. denied*, 102 *N.J.* 355 (1985). These juveniles were, however, eligible for waiver.

On the merits of the waiver decision, the Appellate Division gave insufficient weight to the strong preference for waiver of "Chart 1" offenders now exhibited by the Code of Juvenile Justice. It correctly noted, however, that the trial court may have erred in its resolution of the issue of rehabilitation by predicating its decision upon the fact that the expert witnesses had no working familiarity with the rehabilitative services available to the family court in New Jersey.[7]

---

[7]And on the score of crediting the expert testimony on rehabilitation, that the Family Part may have ascribed inappropriate reasons for rejecting the expert testimony does not mean that it must of necessity be credible. As we noted in *State in the Interest of C.A.H. and B.A.R.*, 89 *N.J.* 326, 343 (1982), "[e]xpert testimony need not be given greater weight than other evidence or than it otherwise deserves in light of common sense and experience." The common sense and experience of the Family Part must always be brought to bear on the ultimate question of rehabilitative potential. For although the weight to be given to expert or other evidence bearing on the probability of rehabilitation properly is to be judged by such factors as the extent to which the witness may have tested the juvenile, the manner of testimony, or the interest of the witness,

This legislative preference leads us to the conclusion that the judgment of the Appellate Division, that directed that the offenders must be tried as juveniles, be reversed. For on the issue of rehabilitation, even if we were to accept the argument of the juveniles that they were indeed amenable to rehabilitation, there would have to be an overall evaluation by the Family Part as to whether or not the probability of rehabilitation substantially outweighed the reasons for transfer.

On the other hand, the trial court may have incorrectly assessed as aggravating factors the very elements of the offense that made the acts a crime of the first-degree. While the court found that "the act as described was committed in a particularly heinous manner," it is the very fact that the actor is aided by another and that physical force or coercion is involved that makes the crime one of the first-degree. *N.J.S.A.* 2C:14–2a(5)(a). The court's conclusion that "[a]n aggravated sexual assault is by its very nature a violent and aggressive act" is but an expression of the very reason that the Legislature has determined this to be a crime of the first-degree.

Applying the standards of appellate review as set forth herein, *supra* at 15–16, the trial court applied incorrect legal principles in two respects. First, it totally removed from the scale the evidence bearing on rehabilitation because of the expert's lack of experience or familiarity with New Jersey's facilities and services. The court must resolve this issue on the basis of its own sense of the matter and experience, with the aid of any available expert testimony. Second, it placed on the scale the very elements that made the offense a first-degree "Chart 1" waiver case.

We are conscious of the long delay from the time of these occurrences to the final disposition of this matter. Consequently, the trial court on remand should promptly reconsider on this

---

none can properly substitute for the court's ultimate responsibility to determine whether the statutory criteria have been met. *See Id.* at 343–44 n. 5.

record the waiver issue in accordance with the principles set forth in the statute and as outlined herein. Any further appellate review should also be accelerated.

A final note about the other claim raised on the appeal, that W.T.P. was constitutionally entitled to the appointment of an independent expert. In this case, W.T.P. retained private counsel and consequently was not entitled to any services available through the public defender's office.

It is doubtful that a juvenile has a constitutional right to a psychiatrist at a waiver hearing. While in *Ake v. Oklahoma*, 470 *U.S.* 68, 105 *S.Ct.* 1087, 84 *L.Ed.*2d 53 (1985), the United States Supreme Court held that an indigent defendant has a constitutional right to a psychiatrist when sanity is a significant factor at trial, the right was outlined there in proceedings where "an individual's life or liberty [was] at risk." *Id.* at 78, 105 *S.Ct.* at 1094, 84 *L.Ed.*2d at 63. New Jersey case law reflects this distinction. A constitutional right to an expert will accrue when guilt or innocence is at issue, and a loss of liberty is at stake. *See State v. Green*, 55 *N.J.* 13, 18 (1969) ("A defendant's lack of funds should not prevent him from obtaining evidence which might establish his innocence"). But in a waiver hearing, guilt or innocence is not at issue. Rather, the focus is on determining the appropriate court to hear the case.

In any event, Rule 5:3–3 permits the juvenile court, in its discretion, to appoint an expert whenever it "concludes that disposition of an issue will be assisted by expert opinion." This is also an inherent power of the court that has long been recognized. In determining whether to exercise that power, the court should "balance competing interests—the expense the public would bear compared to the value of the testimony of the witness." *State v. Cantalupo*, 187 *N.J.Super.* 113, 120 (App. Div.1982), *certif. denied*, 93 *N.J.* 274 (1983).

For the reasons stated, the judgment of the Appellate Division is reversed and the matter remanded to the Family Part for further proceedings in accordance with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ
and Justices CLIFFORD, HANDLER, POLLOCK,
GARIBALDI, O'HERN and STEIN—7.

*Opposed*—None.