19 A.3d 482 (2011)
420 N.J. Super. 144
STATE of New Jersey IN the INTEREST OF A.D., a minor (two cases).
Docket No. A-3720-09T4, A-3721-09T4
Superior Court of New Jersey, Appellate Division.
Argued March 8, 2011.
Decided May 9, 2011.
*484 Nancy A. Hulett, Assistant Prosecutor, argued the cause for appellant State of New Jersey (Bruce J. Kaplan, Middlesex County Prosecutor, attorney; Ms. Hulett, of counsel and on the brief).
Lon Taylor, Assistant Deputy Public Defender, argued the cause for respondent in A-3720-09T4 (Yvonne Smith Segars, Public Defender, attorney; Mr. Taylor, of counsel and on the brief).
Robert G. Gerage argued the cause for respondent in A-3721-09T4.
Before Judges WEFING, PAYNE and KOBLITZ.
The opinion of the court was delivered by
WEFING, P.J.A.D.
The State appeals, pursuant to leave granted, from trial court orders denying its motion pursuant to N.J.S.A. 2A:4A-26 to transfer jurisdiction over juveniles A.D.# 1 and A.D.# 2 from the Family Part to the Law Division, Criminal Part.[1] After reviewing the record, in light of the contentions advanced on appeal, we reverse.
Both juveniles were charged in separate complaints with the following acts of delinquency: conspiracy to murder Angel Vasquez, N.J.S.A. 2C:5-2, N.J.S.A. 2C:11-3; hindering the apprehension of another, N.J.S.A. 2C:29-3a(7); murder of Angel Vasquez, N.J.S.A. 2C:11-3a; attempted murder of Luis Vasquez, N.J.S.A. 2C:5-1, N.J.S.A. 2C:11-3; aggravated assault of Lourdes Diaz, N.J.S.A. 2C:12-1b(1); possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4a; unlawful possession of a weapon, N.J.S.A. 2C:39-5b; and hindering one's own apprehension, N.J.S.A. 2C:29-3b(4).

I
The record before us consists of statements obtained by the police during the course of their investigation, testimony presented by the State in support of its waiver application, exhibits that were received into evidence at that hearing, and the trial court's written opinion setting forth its findings and conclusions that led it to deny the waiver application. Although the statements of the witnesses are not entirely consistent with respect to certain details, the record presents the following factual background. We consider it necessary to set forth the facts in some detail.
The charges against A.D.# 1 and A.D.#2 are based upon an incident that occurred on August 19, 2009, in Woodbridge at a house in which A.D.# 2 lived with his extended family. A.D.# 2 lived in the basement apartment with his parents, Lourdes and Bienvenido and his sister, Kimberly. His grandparents, Lourdes's parents, lived on the first floor, together with three of their young grandchildren. A.D.# 2's uncle, Luis Vasquez, lived on the third floor, together with his girlfriend, Amanda. Luis was sometimes referred to as "Luigi," but we will, for purposes of this opinion, use only the name Luis.
*485 These individuals did not comprise the entirety of A.D.# 2's extended family. He had another uncle on his mother's side, Angel. Angel did not live in Woodbridge with the rest of the family but lived in Keyport with his wife Beatrice. In addition, A.D.# 2 had an older sister, Ruthy, who lived in Perth Amboy with her son, A.D.# 1. Thus, despite the fact that A.D.#2 was only nine days older than A.D.# 1, he was A.D.# 1's uncle. At the time of the incident, both were seventeen years old. A.D.# 2 turned eighteen on the day after this incident occurred, August 20, while A.D.# 1 became eighteen nine days later, on August 29.
A.D.# 1's father is also named Angel; his surname is Ramos. He did not live with A.D.# 1's mother but with his second wife, Melanie. According to the record presented to us, he is an important personage in a street gang known as the Latin Kings and is, on occasion, referred to as King Angel and King D. For ease of understanding, we shall refer to him in this opinion as Ramos.
Although A.D.#2 and his uncle Luis lived in the same house, they did not get along, and A.D.# 2 intensely disliked his uncle. Whether accurate or not, A.D.#2 thought that Luis had struck both his parents and that one of Luis's cousins, Angel Alvarado, had been sexually inappropriate in front of his mother Lourdes.
In the late afternoon of August 19, Luis was in the backyard of the Woodbridge house with Angel Alvarado. A.D.# 2, together with two nineteen-year-old friends, Gary Perry and Ricardo Soto, and A.D.# 1 came to the backyard evidently to confront Luis, and Alvarado thought a fight was likely.[2] According to Alvarado, A.D.#2 said he wanted to talk to Luis, and Luis responded, "I know y'all ain't gonna come over here with beef because that's not right, you're not gonna come over here and disrespect my mom's house." He told A.D.#2 to leave. A.D.#2 responded, "nah, don't worry, we'll be back," to which Luis answered, "ok, come back." A.D.# 2 said that Luis pushed him and reached into a tool box, a gesture which A.D.# 2 understood to mean that Luis was reaching for a knife. With that, A.D.# 2 and his companions left.
In the early evening, however, they headed out to return to the Woodbridge house; according to A.D.# 2 they were simply going there to pick up a video game. At a corner near the house they met Luis and a large group that included Angel Alvarado and A.D.# 2's uncle Angel. They met at a corner near A.D.#2's house, and a fist fight between the two groups erupted in which Luis's group, larger and older, prevailed. In the fight, A.D.# 1 received a beating. Luis reported that he heard A.D.# 2 say that he and his friends would be back and statements to the effect that they had "messed with the wrong one" and that "somebody hit the kid that the father's a King." Beatrice, who witnessed the fight, reported that she heard A.D.#2 say, "You did wrong, you hit one of the Latin Kings kids, this is not over." Alvarado said that Luis had told A.D.#2 to leave and that A.D.#2 responded that they would return, "you just f...ed up right there ... you just hit a King's son, you just hit King Angel's son... don't worry, we'll be back." A.D.# 2's friend Gary Perry reported hearing something similar from A.D.# 2.
A.D.# 2 and his friends left the scene of the fight. They walked to a nearby corner *486 where A.D.# 1 borrowed a cell phone from A.D.# 2 and called his father, Ramos, and told him what had happened. The call was placed at 8:50 p.m. It had started to rain, but the four waited in the rain for Ramos to arrive. Ramos called back at 8:55 p.m. Some estimated the wait at more than half an hour, but eventually a white, four-door car arrived. Ramos was in the front passenger seat, and two other men were in the car. Behind the white car was a black SUV with tinted windows. A.D.# 1 told his father about the fight, and Ramos became visibly angry. Ricardo Soto said that A.D.# 1 said to his father to just forget about the incident, "the cops are coming, let's just forget about it." His father made another phone call and then told the four to get into the white car. Ricardo did not want to participate in another fight and asked Gary to drive him home in his car, and the two left. A.D. # 1 and A.D.# 2, however, got in the car with Ramos.
Ricardo later said that before he and Gary drove off, he saw Bienvenido, A.D.# 2's father, come to the corner and A.D.#2 go back to the house with him. He also said that he got a call from A.D.#2 asking Ricardo and Gary to return to the corner and pick him up. When they arrived, A.D.# 2 was not there.
A.D.# 2, on the other hand, said that he had wanted to go with his father but that Ramos would not let him go, and told him to "get your ass in the car." He also said that he heard A.D.# 1 telling his father "yo, don't do this" and that they were all fine. A.D.# 2 said that A.D.# 1's father seemed to get angrier. In A.D.# 2's final statement he described the scene: "[A.D.# 1] had that face like, like dam, I didn't even want it to be like that. He even said it, he was like I should have never call my dad. And he, he's right, he should of never called his dad."
When they arrived at A.D.#2's house, Ramos told A.D.# 2 to go into the house, take his parents with him, and send Luis outside. He told A.D.# 1 to stay in the car.
Lourdes, Bienvenido, Angel, Beatrice, Luis, Amanda and Alvarado were all present, either on the front steps or in the main hallway. A.D.# 2 walked up to the house and told Luis to go outside and his parents to get inside. Amanda said that she heard Luis say to A.D.# 2, "We didn't let nobody touch you, we was protecting you," to which A.D.#2 replied, "You messed up because you hit King Angel's kid." Amanda said she saw a man standing near a tree and had a feeling he was armed so she told the others the man had a gun. A.D.# 2, his parents Lourdes and Bienvenido, and Angel went to the first floor apartment and closed the door while Luis, Amanda and Alvarado ran upstairs to the second floor. Somehow Beatrice was left on the porch.
Beatrice said she saw two men get out of the car and run up to the house. One man shattered the glass on the exterior door and slapped her in the face, and the other man broke down the main door. She fled down the steps and hid behind a car. She saw the second man enter the house and then she heard gunshots. The man ran out of the house and into the waiting black SUV. She saw A.D.# 1 standing there.
Luis, Amanda and Alvarado heard the gunshots from the second floor apartment to which they had fled. When they heard the sound of cars driving away, they came downstairs and found that Angel and Lourdes had both been wounded by gunshots fired through the door. At 9:28 p.m. Amanda called 911. Luis asked A.D.# 2 who did it, and he responded he did not know. Luis said A.D.# 2 started to walk away, texting on his phone. Luis ran after *487 him, brought him back to the house and seized his phone. A.D.#2, however, said he used his phone to call 911 and that Luis punched him and grabbed his phone as he was giving CPR to Lourdes.
The police responded to the scene, and Lourdes and Angel were taken to the hospital, where Angel was pronounced dead at 10:40 p.m. Lourdes, shot four times and gravely wounded, did survive the attack.
The police took statements from the various witnesses, trying to piece together what had happened and why, including statements from Luis, Amanda, Beatrice, Alvarado, Ricardo, and Gary. In addition, they took four statements from A.D.# 2. These interviews were recorded, and transcripts of each are included in the record.
A.D.# 2 gave his first statement at 1:31 a.m. In it, he said he had been ordered to get into a white Honda with four men whom he did not know and who all had black and white scarves covering their faces. He said one of the four told him to go into his house and tell his uncle Luis to come outside. He said the man also told him that once he was inside himself, he should duck. He said he complied with this order because he was scared of these strangers.
After speaking to other witnesses, the police doubted the accuracy of this statement, and they returned to A.D.# 2, advised him of his Miranda rights, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and told him they did not believe his story. In his second statement, which started at 1:31 a.m.,[3] A.D.# 2 at first said he did not know the four men in the car but admitted they were not wearing masks. He said they were all Latin Kings and that one was named Crizz and one "Orejas," Spanish for "ears." He described Crizz as a man who was "at least in his thirties." He said he was waiting at the corner for Gary to return to pick him up when the white car pulled up, but he did not know why. During this statement he also admitted that he understood the men had guns but that he never thought they were going to shoot someone, only that they were going to punch his uncle Luis. He said that the men asked him if he wanted them to beat up Luis, but he said they should "just hit him once." He denied ever telling Luis after the fistfight that he would be back, denied A.D.# 1 was in the car, denied that A.D.# 1 told his father about the fistfight, (when asked this, he responded that A.D.# 1 did not tell his father "because... his dad would go crazy about it"), denied A.D.# 1's father was in any way involved and pretended not to know who his father was. He insisted he had no idea how the car with the four men showed up. His father was present during the entire interview.
After interviewing more people, the police returned to A.D.# 2 and took a third statement, again providing him with his Miranda warnings. Again, his father was present. This statement started at 9:17 a.m. on August 19. In this statement he admitted that A.D.# 1 had borrowed his cell phone and called his father Ramos to tell him about the beating he had received. He also said Ramos was present in the white car. He said he had been ordered to get into the car and then ordered to "get [his] parents and duck." Then he stopped and would not continue because if he did, he said, the Latin Kings would hurt him.
A.D.# 2's fourth statement was later that day. It was initiated because he indicated he wanted to speak to the police again. Before the interview started, he was again advised of his Miranda rights. *488 In this last statement, he repeated that Ramos appeared angry that his son A.D.# 1 had been beaten and had ordered A.D.# 2 to get into the car. He identified Ramos as a Latin King and identified his picture. He told the police that he knew that Ramos had served time in prison for shooting someone and that his older sister had told him it was because that person had looked at Ramos's girlfriend. He said that when he went to the house to tell Luis to go outside, he was in a hurry; he said "all I got is a little bit of time because I'm afraid of these guys and I know exactly what their [sic] capable of cause if you kill some, if you shoot somebody for a girl, they'll shot [sic] somebody for your kid anytime."
When the police completed their investigation, they filed juvenile delinquency complaints against A.D.# 1 and A.D.# 2, charging the offenses we noted at the outset of this opinion. Shortly thereafter the State moved to waive jurisdiction of the Family Part in order to prosecute the two as adults. A hearing was held at which one witness testified, Investigator Paul Miller of the Middlesex County Prosecutor's Office. When the trial court denied the State's application for each juvenile, the State filed separate motions for leave to appeal. We granted both motions and then consolidated the appeals.

II
Before analyzing the legal contentions, we note the statutory framework that governs our analysis. N.J.S.A. 2A:4A-24 vests in the Family Court jurisdiction over offenses committed by juveniles. N.J.S.A. 2A:4A-26a vests the prosecutor with discretion to seek a waiver of this jurisdiction for certain specified offenses committed by a juvenile fourteen years of age or older. The offenses include criminal homicide, second-degree aggravated assault, possession of a weapon for an unlawful purpose as well as an attempt or a conspiracy to commit any of these offenses. N.J.S.A. 2A:4A-26a(2)(a), (g), (i). These offenses are referred to as "Chart 1" offenses, and the offenses with which A.D.# 1 and A.D.#2 are charged include Chart 1 offenses. A motion seeking such waiver must be filed within thirty days of the filing of the juvenile complaint. N.J.S.A. 2A:4A-26d. The prosecutor's motion in these matters was timely.
An important statutory limitation controls the analysis of a trial court considering a waiver application. N.J.S.A. 2A:4A-26e provides
If the juvenile can show that the probability of his rehabilitation by the use of the procedures, services and facilities available to the court prior to the juvenile reaching the age of 19 substantially outweighs the reasons for waiver, waiver shall not be granted. This subsection shall not apply with respect to a juvenile 16 years or older who is charged with committing [a Chart 1 offense].
In the case of a juvenile sixteen years or older charged with a Chart 1 offense, the only issue to be determined at the waiver hearing is whether there is probable cause to believe the juvenile committed the delinquent act. "On a finding of probable cause for any of these enumerated offenses, no additional showing is required for waiver to occur. Jurisdiction of the case shall be transferred immediately." R. 5:22-2(c)(3). As the Supreme Court has noted, "[s]imply stated, when a sixteen year old or above is charged with an enumerated offense, the prosecutor need only establish probable cause for the court to waive the juvenile to adult court." State v. J.M., 182 N.J. 402, 412, 866 A.2d 178 (2005).

III
After hearing the testimony of Investigator Miller at the waiver hearing, and *489 considering the voluminous exhibits marked at that hearing, the trial court gave an oral decision setting forth its reasons for denying waiver. It stated there was no evidence of an agreement between A.D.# 1 and A.D.# 2 to commit murder, that A.D.# 1 "didn't really comprehend what was about to transpire" when he went to his house, that A.D.#2 tried to convince Ramos not to proceed, that both were controlled "by an older, aggressive male," and that neither knew that the men in the car were armed. It deemed what it considered A.D.# 1's renunciation "critical" to its determination as well as its finding that A.D.#2 never would have gone into the house if he understood his mother was about to be shot.
After this court granted the State's motion for leave to appeal, we also granted its motion to expand the record to include a written opinion from the trial court, issued approximately two weeks later, setting forth the trial court's reasons for denying a waiver application in another juvenile matter. Within that written opinion the trial court set forth its profound disagreement with the philosophy of the present statutory and procedural framework for deciding waiver applications. It noted that, in its view, the decision whether to grant waiver must encompass not only the reasons for the waiver but the potential consequences to the juvenile if waiver were to be granted. The State's appeal in that matter is also before this court.[4]
The decision whether to grant the State's waiver application is, as the trial court recognized, "the single most serious act that the juvenile court can perform." State v. R.G.D., 108 N.J. 1, 4, 527 A.2d 834 (1987) (citation omitted). An appellate court considering the trial court's determination with respect to that question generally considers whether the trial court abused its discretion. State in the Interest of T.M., 412 N.J.Super. 225, 231, 989 A.2d 302 (App.Div.2010). An appellate court will, generally, accord deference to such discretionary determinations. Ibid. If the trial court's determination rests, however, upon a "misconception of the applicable law," its decision is not entitled to deference. Ibid.
We recognize the concerns expressed by the trial court in terms of the consequences that may flow to an individual whose potential responsibility for committing an act is decided in the Law Division of the Superior Court rather than the Family Part. While we cannot fault the trial court for its concern about those consequences, we are satisfied it nonetheless strayed from its duty to apply controlling law. While the trial court referred to Justice O'Hern's statement in R.G.D., supra, about the critical nature of the waiver decision, it did not acknowledge that the statutory framework governing waiver applications has changed substantially from the time R.G.D. was decided. Further, because the trial court's error was a legal one, its decision is not entitled to deference, and our review is plenary.
In the course of its oral opinion, the trial court acknowledged that the State was only required to establish probable cause, that is, "a well-grounded suspicion or belief that the juvenile committed the alleged crime." J.M., supra, 182 N.J. at 417, 866 A.2d 178 (citing State v. Moore, 181 N.J. 40, 45, 853 A.2d 903 (2004)). The State does not have to establish a prima *490 facie case in order to establish probable cause. State in the Interest of T.M., supra, 412 N.J.Super. at 230, 989 A.2d 302. The trial court also acknowledged a corollary principle, that in considering whether the State has established probable cause, "the State is to be awarded every reasonable inference." State in the Interest of J.R., 234 N.J.Super. 388, 395, 560 A.2d 1279 (Ch.Div.1988) (citation omitted). Although the trial court correctly stated those principles, we are constrained to conclude that in the course of its analysis, it strayed from these core principles and disregarded the State's theory of the case.
The State did not allege that A.D.# 1 and A.D.# 2 conspired together to murder Angel and grievously wound Lourdes. Rather, it alleged that they agreed to seek revenge against Luis, enlisted the aid of Ramos and, as a result, are responsible for the foreseeable consequences of their plan. A co-conspirator is "legally accountable" for the conduct of all other persons with whom they were engaged in a conspiracy. N.J.S.A. 2C:2-6b(4). A co-conspirator is "responsible for all criminal acts committed in furtherance of the conspiracy." State v. Bridges, 133 N.J. 447, 454, 628 A.2d 270 (1993), as well as for criminal acts not within the scope of the conspiracy so long as they were "reasonably foreseeable as the necessary or natural consequences of the conspiracy." Id. at 466-67, 628 A.2d 270. The trial court's opinion did not address the concept of vicarious liability.
It also, without explanation, disregarded significant portions of A.D.#2's several statements. We note in particular the trial court's statement that neither knew about the weapon. From his first statement, A.D.#2 acknowledged that he thought the men in the car were armed.
In the course of its opinion, the court cited to what it termed A.D.# 1's "renunciation" and its view that both young men acted under compulsion from Ramos. Those issues, however, are defenses that must be resolved at trial. N.J.S.A. 2C:2-9 defines the defense of duress while N.J.S.A. 2C:5-1d defines the defense of renunciation. A jury may be persuaded to accept these defenses and absolve one or both of criminal responsibility for what occurred. A jury may equally, however, consider their alleged knowledge of Ramos's background, including his membership in the Latin Kings and conviction for shooting someone for looking at his girlfriend, and decide they were, or should have been, aware of the potential consequences of summoning him to the scene. It may also consider their decision to wait an extended period of time in the rain for his arrival. In the context of a probable cause hearing, the State was entitled to the benefit of the favorable inferences that could be drawn from the evidence it presented. Here, the overall thrust of the court's analysis was to disregard those inferences and draw inferences in favor of the juveniles. This it was not free to do.
The trial court orders under review are reversed, and the matter is remanded for further proceedings.
NOTES
[1] Although the juveniles have different names, they have the same initials. We shall distinguish them throughout this opinion by the additional numeric.
[2] The statements are not consistent as to just who was with A.D.# 2 in this initial encounter, but the disparity is not material to this appeal. A.D.# 2 was an uncle to Soto, just as he was to A.D.# 1.
[3] The cover sheet of the statement indicates 1:31 a.m.; during the administration of Miranda rights, one of the officers refers to it being 4:38 a.m.
[4] The State filed an additional motion to supplement the record to include DVDs of four additional proceedings during which the trial court expressed views about waiver applications. Decision on that motion was reserved for the merits panel. In light of our disposition of this appeal, the motion is denied as moot.