# RECORD IMPOUNDED

## NOT FOR PUBLICATION WITHOUT THE
## APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3516-19T1

STATE OF NEW JERSEY IN
THE INTEREST OF Z.S.,
a Juvenile,[1]

_____

APPROVED FOR PUBLICATION

August 18, 2020

APPELLATE DIVISION

Argued telephonically July 14, 2020 –
Decided August 18, 2020

Before Judges Sabatino, Natali and Susswein.[2]

On appeal from an interlocutory order of the Superior
Court of New Jersey, Chancery Division, Family Part,
Salem County, Docket No. FJ-17-0013-20.

Joseph J. Russo, Deputy Public Defender,
argued the cause for appellant Z.S. (Joseph E.
Krakora, Public Defender, attorney; Joseph J. Russo,
of counsel and on the briefs; Gabrielle Brandt Hall,
Assistant Deputy Public Defender, on the briefs).

David M. Galemba, Assistant Prosecutor,
argued the cause for respondent State of New Jersey
(John T. Lenahan, Salem County Prosecutor, attorney;
David M. Galemba, of counsel and on the briefs).

Daniel Finkelstein, Deputy Attorney General,
argued the cause for amicus curiae Attorney General

---

[1] We use initials to protect the minors involved in this case.

[2] Special panel appointed to hear this appeal by order dated June 17, 2020.

(Gurbir S. Grewal, Attorney General, attorney; Daniel Finkelstein, on the briefs).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey; (Alexander Shalom and Jeanne LoCicero, on the brief).

Elana Wilf argued the cause for amicus curiae Rutgers Criminal and Youth Justice Clinic and the National Juvenile Defender Center (Rutgers Criminal Youth Justice and the National Juvenile Defender Center, attorneys; Elana Wilf, of counsel and on the brief; Laura Cohen, on the brief; Sherika J. Shnider (National Juvenile Defender Center), on the brief; Adina Heistein and Hannah Dodson, admitted pursuant to Rule 1:21-3(b), on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This interlocutory appeal shines a spotlight upon the appropriate procedures under current statutes for evaluating whether a juvenile charged with a very serious offense should be waived to the Criminal Part and prosecuted as an adult.

On leave granted, the juvenile in this case, defendant Z.S., appeals the Family Part judge's order sustaining a prosecutor's decision to waive him to the Criminal Part to face a jury trial for committing first-degree aggravated sexual assault upon a five-year-old boy.

Z.S. was age seventeen at the time of the charged offense. He is intellectually disabled, suffers from diagnosed mental illnesses, and was himself the victim of sexual assault as a young child. He has been determined after a hearing by the Social Security Administration to be disabled, and he is classified as a special-needs student in school. The prosecutor has accepted as true the opinion of an evaluating psychiatrist that Z.S. has the "intellectual age" of a thirteen-and-a-half-year-old child, which happens to be below the chronological age of fifteen required for waiver under the present statute.

As explained in this opinion, we vacate the trial court's order because of several critical deficiencies in the processes that resulted in Z.S.'s waiver. Among other things, the prosecutor's written statement of reasons in support of waiver was incomplete, conclusory, and utilized obsolete 2000 guidelines that do not track the controlling factors under the revised 2016 waiver statute.

In addition, the prosecutor failed to explain in writing in advance of the waiver hearing why the extensive mitigating psychological evidence marshalled by the defense was inconsequential.

Further, the trial court misapplied its discretion by declining to adjourn the waiver hearing at defense counsel's request, with the State's acquiescence,

3

after she had been released from the hospital for pneumonia only two days earlier and was still feeling ill and having difficulty breathing.

Because of these grave procedural shortcomings, we accordingly remand this matter for a renewed waiver hearing. In the course of our discussion, we offer guidance on how best to proceed in such waiver matters under the revised 2016 statute. We do so to assure that such determinations are handled fairly by prosecutors and courts in the future, and the problems that occurred here are not repeated.

## I.

Before we delve into the facts and chronology of this case, it is useful to describe the legal and constitutional standards that must guide juvenile waiver decisions.

As that term is used in this State, a juvenile waiver[3] entails the transfer of jurisdiction from the Family Part to the Criminal Part, where the juvenile

---

[3] The long-standing use of the term "waiver" in this context is somewhat peculiar. In general, a "waiver" involves a "voluntary relinquishment of a known right" evidenced by a clear, unequivocal and decisive act from which an intention to relinquish the right can be based. Sroczynski v. Milek, 197 N.J. 36, 63-64 (2008) (quoting Knorr v. Smeal, 178 N.J. 169, 177 (2003)). A judge's "waiver" of a juvenile to adult court is, by contrast, normally involuntary, although it can be requested by the juvenile. See N.J.S.A. 2A:4A-26.1 (involuntary waiver) and N.J.S.A. 2A:4A-27 (voluntary waiver).

will be tried as an adult and face adult criminal punishment if found guilty of the charged offenses.

As our Supreme Court has recognized, "waiver to the adult court is the single most serious act that the juvenile court can perform . . . . because once waiver of jurisdiction occurs, the child loses all the protective and rehabilitative possibilities available to the Family Part." State v. R.G.D., 108 N.J. 1, 4-5 (1987). The minor charged with committing the wrongful acts, if they are proven, usually will be exposed to much more severe punitive sanctions, often including lengthy prison terms and mandatory periods of parole ineligibility. In addition, the offender will no longer be eligible for the special programs available to juveniles. The gravity of this decision frames our analysis of this appeal.

The transfer of jurisdiction over a minor to adult court is so momentous that it has constitutional dimensions. Procedural safeguards are vital to assure the juvenile has a fair opportunity to advocate against waiver. Decades ago, the United States Supreme Court recognized "there is no place in our system of law for reaching a result of such tremendous consequences without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons." Kent v. United States, 383 U.S. 541, 554 (1966). These

imperatives for the waiver process are consistent with the Supreme Court's recognition that, under the Due Process Clause, a minor who has been charged with delinquent acts has a constitutional right to such protections as adequate notice of the charges, an opportunity to be heard at a fair hearing, and competent counsel. In re Gault, 387 U.S. 1, 12-59 (1987).

The Evolution of the Waiver Laws

The standards for juvenile waiver have evolved over the years, culminating with the 2016 statute that controls the present case. The periodic changes reflect a re-balancing of who should be subject to involuntary waiver. Meanwhile, there has been a continual emphasis on the need for vital procedural safeguards that reflects the gravity of the waiver decision.

As of the time of the Supreme Court's 1966 opinion in Kent, many jurisdictions focused more on "determining the needs of the child [charged with the offenses] and of society rather than adjudicating criminal conduct." 383 U.S. at 554-55. "By the late 1960s, however, dissatisfaction with the operation of juvenile courts led to a nationwide shift in emphasis in the direction of custodial sentences for older juvenile offenders that commit serious crimes." In re Registrant J.G., 169 N.J. 304, 322 (2001).

Our State's juvenile waiver laws have largely mirrored this nationwide trend. The 1983 waiver statute, as described by our Supreme Court, reflected a "concern that the juvenile justice system had dealt inadequately with serious offenders even as it may have dealt too severely with less serious offenders" and therefore intended "to shift the process towards waiver" for "certain serious juvenile offenders." R.G.D., 108 N.J. at 8-9. Under that 1983 version of the statute, the court at a prosecutor's request could waive a minor who was age fourteen or over at the time of the charged offenses, if the State established probable cause that the juvenile committed an enumerated serious offense.[4] Id. at 9. Waiver was disallowed only if the defense proved a probability of rehabilitation achievable by age nineteen that "substantially outweigh[ed] the reasons for waiver." Id. at 11.

The revised waiver statute adopted in 2000 prescribed standards that made it easier to waive minors aged sixteen or older to the Criminal Part if they were charged with certain enumerated offenses. J.M., 182 N.J. at 412. It directed that a prospect of rehabilitation could not prevent waiver for a juvenile offender over age sixteen if he or she was charged with homicide,

_____

[4] For other, less serious crimes, the State was required to "show that the nature and circumstances of the offense or the prior record of the juvenile were sufficiently serious and that the interests of the public required waiver." State v. J.M., 182 N.J. 402, 411 (2005); N.J.S.A. 2A:4A-26(a).

7

first-degree robbery, or other specified very serious offenses. N.J.S.A. 2A:4A-26(e).

Of pertinence here, the 2000 statutory revision also instructed the Attorney General to develop and disseminate to county prosecutors "guidelines or directives deemed necessary or appropriate to ensure the uniform application of [the waiver standards] throughout the State." N.J.S.A. 2A:4A-26(f). The Attorney General did so, promulgating such Guidelines in March 2000. Office of the Attorney Gen., Juvenile Waiver Guidelines (Mar. 14, 2000) ("the AG Guidelines").

As described by the Supreme Court recently in State v. J.V., ___ N.J. __ (2020), the AG Guidelines:

> instructed prosecutors seeking to file a juvenile waiver motion to consider: (1) the nature of the offense; (2) the need for deterrence; (3) the effect of the waiver on the prosecution of any co-defendants; (4) the maximum sentence and length of time served; (5) the juvenile's prior record; (6) trial considerations, such as the likelihood of conviction and the potential need for a grand jury investigation; and (7) the victim's input.
>
> [slip op. at 5.]

Further, and significantly for the present case, the AG Guidelines "directed prosecutors filing a waiver motion to include a statement of reasons

addressing the prosecution's consideration and the applicability of the factors." Ibid. (emphasis added).  In J.M., 182 N.J. at 419, the Supreme Court required prosecutors to submit this written statement of reasons with the waiver motion, so that judges could review the State's reasons and "determine that the reasons seeking waiver were not arbitrary."

The waiver statute was amended again in 2003 and 2008 in ways that are not pertinent to our discussion.

The 2016 Revised Statute

In 2015, the Legislature enacted major revisions to our State's juvenile justice system, including a revamping of the waiver statute, to be effective in March 2016.  L. 2015, c. 89, § 1.  Section 26 of Title 2A:4A was repealed and replaced with new Section 26.1.

Among  other things the revised 2016 statute raised the minimum age for an offender's eligibility for waiver from fourteen to fifteen.  N.J.S.A. 2A:4A- 26.1(c)(1).  The Legislature also revised the waiver statute to replace the previous construct with "a streamlined process" for determining whether a juvenile case should be transferred to an adult criminal court.  Assem. Appropriations Comm. Statement to S. 2003 (June 15, 2015).  The revised law requires the waiver motion to be "accompanied by a written statement of

reasons" from the prosecutor "<u>clearly setting forth</u> the facts used in assessing all [of the enumerated waiver] factors . . . together with <u>an explanation as to how evaluation of those facts</u> supports waiver for each particular juvenile." N.J.S.A. 2A:4A-26.1(a) (emphasis added).

The new list of statutory waiver factors that prosecutors must now consider is as follows:

> (a) The nature and circumstances of the offense charged;
>
> (b) Whether the offense was against a person or property, allocating more weight for crimes against the person;
>
> (c) Degree of the juvenile's culpability;
>
> (d) Age and maturity of the juvenile;
>
> (e) Any classification that the juvenile is eligible for special education to the extent this information is provided to the prosecution by the juvenile or by the court;
>
> (f) Degree of criminal sophistication exhibited by the juvenile;
>
> (g) Nature and extent of any prior history of delinquency of the juvenile and dispositions imposed for those adjudications;
>
> (h) If the juvenile previously served a custodial disposition in a State juvenile facility operated by the Juvenile Justice

Commission, and the response of the juvenile to the programs provided at the facility to the extent this information is provided to the prosecution by the Juvenile Justice Commission;

(i) Current or prior involvement of the juvenile with child welfare agencies;

(j) Evidence of mental health concerns, substance abuse, or emotional instability of the juvenile to the extent this information is provided to the prosecution by the juvenile or by the court; and

(k) If there is an identifiable victim, the input of the victim or victim's family.

[N.J.S.A. 2A:4A-26.1(c)(3).]

The Supreme Court has observed these eleven factors "encompass and expand upon the factors listed in the [AG] Guidelines." State in the Interest of N.H., 226 N.J. 242, 252 (2016).[5]

The new enumerated factors eliminate any express reference to a juvenile's "possibility of rehabilitation." As we have already noted, under the

---

[5] Unlike the previous statute, the 2016 legislation did not mandate the Attorney General to issue new Guidelines to prosecutors but did note that he or she "may" do so "to ensure uniform application" of the statutory factors "throughout the State." N.J.S.A. 2A:4A-26.1(c)(3). For reasons that have not been explained, the Attorney General thus far has not rescinded the 2000 Guidelines and issued new ones, despite the many substantive changes caused by the 2016 legislation repealing the former statute.

prior statute, certain eligible juveniles could defeat a waiver motion by demonstrating that "the probability of his rehabilitation . . . substantially outweighs the reasons for waiver." State in re V.A., 212 N.J. 1, 9 (2012) (quoting the prior statute). Such language is omitted from the 2016 revised statute. Even so, the new factors arguably allow some consideration of the juvenile's prospects for rehabilitation, at least implicitly, by requiring the prosecutor to assess a juvenile's "age and maturity," "culpability," "criminal sophistication," and prior history with the juvenile justice system. N.J.S.A. 2A:4A-26.1(c)(3)(a), (c), (f), (g), (h).

The amended 2016 statute also differs from the prior statute in that the obligation to consider relevant factors applies to all eligible juveniles. As we noted earlier, under the previous statute, a juvenile who was sixteen or older and who committed an enumerated serious crime was not permitted to forestall waiver by demonstrating the possibility of rehabilitation. See In re State ex rel. A.D., 212 N.J. 200, 216 (2012) (describing the statute as amended in 2000). That age-sixteen cutoff no longer exists.

In comparing the old law with the revised law, the public defender has pointed out that none of the eleven factors adopted in the 2016 revision mention the term "deterrence," despite the fact that "the need for deterrence"

A-3516-19T1

was a key listed consideration under the AG's 2000 Guidelines. It urges us to construe the 2016 statute to signify that the Legislature intended to eradicate any consideration of deterrence from the waiver calculus. In this regard, counsel cites to recent scholarly research in brain science. According to the public defender, that research suggests that younger adolescents tend to be more prone to impulsive behavior, and less deterred by penal measures, than was previously understood.[6]

Although we appreciate the references to scholarship, counsel have not furnished us with any legislative history from the 2015 enactment specifically reflecting that the Senate, General Assembly, and Governor intended to eliminate deterrence considerations in waiver cases altogether. To the contrary, it is conceivable that deterrence may be implicitly encompassed in factors (a) (the nature and circumstances of the offense charged); (c) (the degree of the juvenile's culpability); (g) (the nature and extent of any prior

---

[6] We need not make any independent judicial determination here, in the absence of an evidentiary hearing with expert testimony, that such research is scientifically valid and indisputable. We simply note the research seems to be consistent with the Legislature's decision to increase the minimum waiver age by one year as an ameliorative measure—a reform that takes into account, at least incrementally, the frequent immaturity and impulsivity of younger minors. See N.J.S.A. 2A:4A-26.1(c)(1).

13

delinquency adjudications); and (k) (the victim's input, which could logically concern his or her fears of a repeated offense). N.J.S.A. 2A:4A-26.1(c)(3).

While we do not think it inconsequential that deterrence has been omitted from the list of eleven waiver factors, we are unpersuaded the Legislature intended that prosecutors and judges must ignore that concept completely when evaluating whether a juvenile should be waived. Instead, just as we have noted with respect to the omission of rehabilitation from the list of factors, we construe the statute to leave room for the concept as being impliedly subsumed within other factors. However, because it is not enumerated in the revised law, deterrence should not be afforded the full weight of a listed factor. Instead, like rehabilitation, it is at most a subsidiary and optional consideration.

Notably, the eleven factors insert concepts that previously had not been mentioned in the former statute or in the AG Guidelines, at least explicitly. Those additions include such things as: (e) the juvenile's eligibility for special education; (i) current or prior involvement with child welfare agencies; and (j) mental health concerns, substance abuse, or emotional instability. Such evidence of the juvenile's background, where it exists, seemingly would weigh against waiver, although perhaps not universally. Additionally, factor (f), the

degree of the juvenile's criminal sophistication, could weigh against waiver if the juvenile is shown to be naïve and lacking in that trait, or conversely in favor of waiver where such sophistication is present.

On the other hand, new factor (k), the input of an identifiable victim, would seem to weigh often in favor of waiver, if the victim wishes the juvenile to be confined for a long period of time or otherwise severely punished. The factor could, however, weigh against waiver if the victim urges leniency for the juvenile.

The revised statute does continue the strong presumption in favor of waiver for certain juveniles who commit serious acts and maintains the associated "heavy burden" on the juvenile to defeat a waiver motion. R.G.D., 108 N.J. at 12.

The standard of review for a waiver decision likewise remains unchanged under the new statute. The prosecutor is vested with the discretion to seek or not seek waiver in presumptive cases. N.H., 226 N.J. at 249 ("Recent iterations of the law, as well as the current statute, focus on the prosecutor's exercise of discretion.").

Consequently, the standard of review of the prosecutor's waiver decision is deferential. The trial court should uphold the decision unless it is "clearly

convinced that the prosecutor abused his discretion in considering" the enumerated statutory factors. N.J.S.A. 2A:4A-26.1(c)(3); R. 5:22-2; N.H., 226 N.J. at 255 ("[U]nder the new law as well as the old, the prosecutor's decision to seek waiver is subject to review—at the hearing—for abuse of discretion.").

## II.

With this legal backdrop, we summarize the facts and circumstances of this case, mindful that the State's charges have yet to be proven at a trial.

### A. The Charges

In July 2019, Z.S. was charged in complaint number FJ-17-013-20 with offenses that would have constituted the following crimes if committed by an adult: aggravated sexual assault (first-degree), N.J.SA. 2C:14-2(a)(1) (count one) and endangering the welfare of a child (third-degree), N.J.S.A. 2C:24-4(a) (count two). At the time of the commission of the alleged offenses, Z.S. was seventeen years old.

### B. The Prosecutor's Waiver Motion and Initial Statement of Reasons

On August 23, 2019, the prosecution filed a motion in the Family Part for involuntary waiver of Z.S. The motion was filed within the sixty-day deadline required by statute, N.J.S.A. 2A:4A-26.1(a). It was accompanied by

A-3516-19T1

a seven-page "Prosecutor's Statement of Reasons," which we will discuss at length in Part III of this opinion.

A waiver hearing was originally scheduled for September 25, 2019. According to Z.S., however, his mother refused to allow him to meet with his attorney until September 17, 2019. Therefore, on or around September 24, 2019 Z.S.'s assigned public defender requested a postponement due to this delay and "to obtain [his] school records, mental health records, and other necessary documents." At that time, his counsel also requested a competency hearing.

On September 25, the trial court denied Z.S.'s counsel's request for a competency hearing, according to Z.S. because it found he did not present any indicia of being incompetent, [7] and adjourned further proceedings until December 4, 2019.

In October 2019, Z.S. moved to obtain records concerning him from the Department of Child Protection and Permanency ("DCPP"). The parties and the court then entered into a consent order on November 8, 2019, which was submitted to the DCPP to facilitate obtaining the records.

---

[7] Neither party provided a transcript from this earlier proceeding, and neither describes the court's ruling or rationale in more than cursory detail. It is uncontested that if waiver is upheld, a renewed competency evaluation request could be filed in the Criminal Part.

A-3516-19T1

Thereafter, in November 2019, Z.S.'s counsel requested the appointment of a guardian ad litem to assist with his representation because of his mother's non-cooperation. The trial court granted this request. The guardian ad litem, an attorney, was present for the subsequent waiver hearing, and the court allowed him to confer with Z.S.'s public defender during the proceeding.

On December 4, 2019, the second scheduled waiver hearing date, the trial court granted Z.S.'s request for additional postponement to allow the guardian ad litem further time to familiarize himself with the case and because the requested DCPP records had not yet been delivered to Z.S. The court gave Z.S. until January 6, 2020 to supplement the record with additional materials and gave the State until February 12, 2020 to respond. The waiver hearing was rescheduled to February 19, 2020. According to Z.S., his attorney obtained the DCPP records on January 7, 2020.

On January 17, 2020, Z.S. provided the State through counsel with various materials supporting his arguments against waiver. Because the contents of those materials are important in evaluating the sufficiency of the prosecutor's written analysis of the waiver factors, we discuss them at length here.

C. The Expert Reports and Other Mitigation Materials

Z.S. provided the State with the following materials: an October 2019 psychological evaluation by Dr. David Bogacki; an earlier January 2018 psychological evaluation conducted by Dr. Billie Slaughter in conjunction with the Salem City school district; a November 2017 psychiatric evaluation by Dr. Ricardo Oasin; a January 2019 Individualized Education Program ("IEP") from the Salem City school district; a Social Security ruling establishing the juvenile as disabled as defined in the Social Security Act and under 20 C.F.R. § 416.924(c); and DCPP records for in camera review.

Dr. Oasin's 2017 Evaluation

In his November 2017 evaluation conducted at the request of the Salem City school district, Dr. Oasin concluded that at the time Z.S.'s mental status was that of a "15-year-old adolescent male," equivalent to his chronological age. However, despite "perfect" attendance in school, he was failing classes and was not on track to graduate.

Dr. Oasin described a variety of "oppositional and defiant behaviors" at home and in school, difficulty behaving in public, and in interacting with other children and adults. Z.S. was failing classes, regularly acted out in school, and was known as a class clown. He suffered from low self-esteem and occasional

suicidal thoughts and did not have friends in his neighborhood. Dr. Oasin also considered his prior history of being sexually abused as a young child.

Dr. Oasin concluded that Z.S. suffered from Attention Deficit Hyperactivity Disorder ("ADHD") and pediatric bipolar disorder and was concerned about the "mood situation" represented by his suicidal ideation and low self-esteem. He recommended a regimen of both mood stabilizers and psychotherapy to address these issues. However, he also found Z.S. was "intelligent" and expressed "guarded" optimism that this situation could improve with treatment.

Dr. Slaughter's 2018 Evaluation

In January 2018, Billie A. Slaughter, Ph.D., conducted a confidential psychological evaluation of Z.S. on behalf of the Salem City school district. Z.S. was referred after a diagnosis of ADHD and "continuing failing grades in school."

According to his teachers, Z.S. could complete his work satisfactorily when focusing on a task, but was regularly late to school, highly distractible, and struggled to stay focused. He was failing all but one class. He was taking medication for his ADHD.

Dr. Slaughter concluded that Z.S. had an IQ of eighty-three, which fell in the "low-average range of intelligence." He had "poor organizational skills" which impacted his ability to complete schoolwork. He was below average in "visual-motor perceptual organization, speed and efficiency," deficient in "attention to detail, visual information processing, and abstract reasoning," and struggled with "higher order thinking tasks."

The 2019 IEP Assessment

In January 2019, Z.S., his mother, and Salem City High School teachers participated in an IEP meeting for an annual review of Z.S.'s progress in school.

Z.S. was in special education "pull out" classes for social studies, mathematics, science, and language arts literacy. Z.S. was failing or close to failing several classes, including Economics, Physical Education/Health, and Environmental Science, but was receiving "Bs" or better in several classes. He could and did perform well on tests, but frequently did not complete tasks or homework. He had a significant number of absences, and his "attendance remains the most significant challenge to his advancement in school . . . . [it] directly impacts his education and is a major influence into poor and failing grades." The school planned to continue to provide special education classes

21

for Z.S. for a significant portion (between 20-60%) of the school day because he would likely struggle with the size and pace of general education classes.

Dr. Bogacki's 2019 Evaluation

At the request of Z.S.'s counsel, David Bogacki, Ph.D., conducted a psychological evaluation of Z.S. on October 31, 2019.  In reaching his conclusions, Dr. Bogacki relied on "a review of materials, [a] mental status examination, [an] interview with [Z.S.'s] mother and clinical data derived from psychological testing."  He performed five different diagnostic assessments on Z.S.

Dr. Bogacki described the available information about Z.S.'s upbringing. He noted that Z.S. demonstrated no mental or physical health problems as a young child but that he "was sexually molested at age 5 by a cousin." Although Z.S. did not apparently have memories of the event, shortly thereafter he "began acting out." He started to undergo therapy, but "never had any sustained treatment for sexual abuse."  He had prior diagnoses for ADHD and bipolar disorder.

According to an interview with Z.S.'s mother, he had frequent angry outbursts, and a "bad attitude," but was not aggressive towards family members.  He had "a history of school behavioral problems," including

insubordination, fighting, and refusing to do homework, and had been suspended twice.

Dr. Bogacki observed that Z.S.'s mood was within "normal limits," his speech was logical and coherent, and he was aware of his surroundings. He acknowledged his anger problems and did not present psychotic symptoms. He suffered from mood swings and depression that made it difficult to complete tasks, including schoolwork, but these problems were reduced by medication.

Dr. Bogacki found that Z.S. had "low-average" intellectual functioning and an IQ of eighty-one, which was in the 10th percentile of his age group. There were indications of a learning disability. Dr. Bogacki determined that he had the "mental age" of a thirteen-and-a-half-year-old child.

Dr. Bogacki noted that Z.S. suffered from depression and low self-esteem, was "quite narcissistic" and could "become argumentative and revengeful at times." He vacillated between "passive compliance and obedience" and "stubborn contrariness." He was "aloof and introverted" and had serious difficulties forming relationships. He had "borderline personality traits" and intense, frequent mood swings. Dr. Bogacki concluded he suffered from a Major Depressive Disorder, ADHD and "a subtle learning disability."

A "formal diagnosis of Personality Disorder" was not warranted but he had many "emerging" negative psychological traits.

Dr. Bogacki made further findings related to Z.S.'s ability to be successfully rehabilitated. He noted that Z.S. had no meaningful early conduct with the criminal justice system apart from this arrest. He did not have a history of drug use. He had a supportive family structure.

Dr. Bogacki found Z.S.'s challenges in school, including his "history of special education," "mild cognitive defects," and "mild behavioral problems" were the result of underlying interpersonal and psychological issues. His social isolation and underlying mental issues would require substantial rehabilitation efforts but were "amenable to change."

Dr. Bogacki concluded Z.S.'s actions likely arose "out of confusion about his sexual identity, impulsivity related to emerging sexual urges and a significant mental disorder (bipolar disorder)" and were not a result of underlying "anti-social or pro-criminal attitudes." Z.S. was a "good candidate for rehabilitation" and should not be incarcerated as an adult.

The 2019 Social Security Disability Ruling

In a November 13, 2019 decision, federal Administrative Law Judge Kimberly Varillo found, after a hearing, that Z.S. was disabled and eligible for supplemental Social Security Income ("SSI").

Z.S. was found to have ADHD, bipolar disorder, and Oppositional Defiant Disorder ("ODD"). ALJ Varillo found he had "a marked limitation" in "attending and completing tasks" and in "interacting and relating with others." His mother testified that he did not have friends and did not get along with peers or adults. His grades were poor but improving after being placed in smaller classes and after he began using a prescribed stimulant to help his focus.

ALJ Varillo found observations of Z.S.'s frequent outbursts and behavioral issues in school were persuasive and indicated "marked limits in attending and completing tasks and interacting with others." She found that mental assessments by State agency psychological consultants were "not persuasive because evidence received at the hearing level shows that [Z.S.] is more limited than determined by State agency consultants." She also found that the State's experts "did not consider the combined effect of the claimant's impairments" in determining that he was not disabled.

D. The Illness and Hospitalization of Defense Counsel

25

One week before the scheduled waiver hearing of February 19, 2020, Z.S.'s counsel was diagnosed with pneumonia and tachycardia and was hospitalized. She was "medically cleared" to return to work on February 20, 2020.[8] A scheduled pretrial conference between the State and Z.S.'s counsel on February 13, 2020 did not occur due to these health concerns. According to the State, the purpose of that conference was to determine whether testimony would be needed to admit any of the mitigating documents Z.S. had provided.

E. The State's Two-Page Supplemental Letter

On February 18, 2020, the State filed a two-page letter with the court describing the materials it had received from Z.S.'s counsel and asserting that the prosecutor had considered those additional materials. The letter stated that the materials caused the State to "now find[] applicable" three statutory factors that it had not previously found applicable, namely (e) (the juvenile's eligibility for special education); (i) (current or past involvement with child welfare agencies); and (j) (evidence of mental health concerns, substance abuse, or emotional instability).

As we will discuss in Part III, the prosecutor's cursory supplemental letter did not comment substantively on any of the defense submissions, except

---

[8] The record contains no doctor's note or medical documentation, and the exact meaning of "medically cleared" is uncertain.

it noted that the State had considered the materials and "most importantly" had "heavily consider[ed]" DCPP records indicating that Z.S. had been sexually assaulted himself when he was about six years old.

The supplemental letter concluded:

> While the State considered the additional information and how it relates to the eleven (11) factors the State must consider under N.J.S.A. 2A:4A-26.1, the State continues to seek waiver as the factors in favor of waiver continue to outweigh those against.

No further written explanation was provided. The letter did not quote from or refer to any of the specific contents of the expert psychological reports, Social Security findings, or special education records presented by defense counsel.

According to Z.S., his counsel did not receive the prosecutor's written supplemental reasons until February 19, 2020. Z.S.'s counsel was informed orally at an earlier date of the prosecutor's decision to continue to seek waiver.

The waiver hearing was postponed for one day until February 20, 2020 due to Z.S.'s counsel's health concerns. A hearing was conducted on that date before a Family Part judge.

F. The Waiver Hearing and the Court's Adjournment Denial

27

At the hearing, Z.S.'s counsel advised the court that, although she had prepared for the hearing, she was still feeling ill, was having difficulty breathing, and had not had a chance to review the supplemental letter with her client. Defense counsel accordingly requested a further postponement of the hearing for these medical reasons, with the consent of the prosecutor and the guardian ad litem.

As we will discuss in Part IV of the opinion, the court denied defense counsel's unopposed adjournment request, and elected to proceed with the waiver hearing. Among other things, the court noted the matter had been adjourned several times already, that the State's detective was present and ready to testify about probable cause, and that members of the victim's family were present. The court also remarked that defense counsel was an able attorney, and that it was in Z.S.'s best interests to hold the hearing.

The State then presented testimony from Sergeant Amy Hill concerning probable cause. Defense counsel, despite her illness, cross-examined Hill. The State also played for the court recordings of interviews with Z.S. and the alleged victim.

G. The State's Evidence of Probable Cause

Without detailing here prematurely before trial all of the factual details, the State's evidence of probable cause at the waiver hearing may be summarized as follows.

On July 5, 2019, Salem City police responded to a 9-1-1 call that one or more individuals were attempting to break into a house. Among the responding law enforcement officers was Sergeant Hill, a detective with the Salem County Prosecutor's Office, who testified at the hearing. Several individuals outside the home told Hill that their five-year-old relative, A.L., had been sexually assaulted by someone inside the house. Hill entered the house, where Z.S.'s mother allegedly told Hill that Z.S. had admitted to his stepfather that he had sexually assaulted A.L.

At Hill's request, Z.S. and his mother went to the Salem City police station for further investigation. Once at the station, Hill recorded a formal statement from Z.S. with his mother present. His mother initially consented to the interview and Z.S. and his mother were both read their <u>Miranda</u>[9] rights. Both Z.S. and his mother signed the <u>Miranda</u> card signifying they were read and understood those rights.

---

[9] <u>Miranda v. Arizona</u>, 384 U.S. 346 (1966).

During the course of his interview, Z.S. recounted that one day he had gotten out of a shower with a towel wrapped around him, and went into his room, where A.L. was present. According to Z.S., while he was looking for his underwear, A.L. touched his leg and asked him "Can I eat it?" Z.S. admitted that he let the boy touch him. A.L. then allegedly asked Z.S. to do the same thing to him. When asked if he did anything at that point to A.L., Z.S. responded, "[n]ot at first." Before he elaborated about that, Z.S.'s mother asked for an attorney, terminating the interview.

Sergeant Hill then interviewed A.L., who was accompanied by his mother. The officer showed A.L. a drawing of an anatomically correct pre-pubescent male. A.L. referred to the penis on that drawing as "pee-pee" and the buttocks as "butt." When asked if anyone had ever touched his penis, A.L. responded that Z.S. had. A.L. told the interviewer that Z.S. had pulled down his pants on several occasions and had licked his penis and buttocks. Using his own vocabulary, A.L. also described how Z.S. had ejaculated.

The officers also interviewed D.S., a sixteen-year-old family friend of A.L. D.S. told the officers that, on the morning of July 3, 2019 she was sleeping in the same bed with A.L.'s grandmother and A.L. She felt A.L.'s hand reaching into her pants and pushed it away. She asked A.L. where he

learned to do that. A.L. allegedly responded that he had learned it from Z.S., who had put his "pee-pee" in A.L.'s mouth, and vice-versa. The officers interviewed A.L.'s grandmother, and she gave a similar account of the incident.

Upon considering the waiver hearing evidence, the court ruled that the State had met its burden as to probable cause.

H. Argument and Ruling on the Waiver Issue

Next, the court heard oral argument on the waiver issue. During the argument, the prosecutor explained, for the first time in any depth, why its office had found the defense's mitigating materials unpersuasive and was continuing to press for waiver. Defense counsel extemporaneously attempted to respond to these points.

Defense counsel did not present any witnesses at the waiver hearing, but did supply the court with the psychological evaluations, school records, DCPP records, and Social Security disability ruling. The prosecutor did not present any expert reports or other witnesses to counter the defense materials. At the conclusion of the hearing, the court issued an oral opinion determining that the State had not abused its discretion, and accordingly approved the waiver.

I. Leave to Appeal and the Amici

A-3516-19T1

Z.S. moved for leave to appeal the waiver ruling, principally arguing that the prosecutor's written statements of reasons were deficient, that his counsel had not been given enough time to deal with the State's supplemental letter, and that the trial court should have adjourned the waiver hearing given the illness of his counsel. Notably, Z.S. did not appeal the court's finding of probable cause.

We granted leave to appeal. We also invited the Attorney General and the American Civil Liberties Union of New Jersey ("ACLU") to participate as amici, both of whom appeared and filed briefs. In addition, the Rutgers Criminal and Youth Justice Clinic ("CYJC") and the National Juvenile Defense Center ("NJDC") jointly filed a motion to appear as amicus curiae (the "Rutgers amici"). The request was unopposed by the parties and granted by this court.[10]

J. Z.S.'s Points on Appeal

On appeal, Z.S. raised the following points in his initial motion brief:

POINT I

THE INTERESTS OF JUSTICE REQUIRE INTERLOCUTORY REVIEW, RULE 2:2-4 STATES THAT THE APPELLATE DIVISION MAY GRANT

---

[10] We thank the amici for their thoughtful contributions to the briefing and oral argument in this accelerated appeal.

LEAVE TO APPEAL FROM AN INTERLOCUTORY ORDER "IN THE INTERESTS OF JUSTICE."

POINT II

THE PROSECUTOR ABUSED HER DISCRETION IN SEEKING WAIVER OF Z.S. BECAUSE THE STATEMENT OF REASONS FAILED TO PROVIDE FACTUAL ANALYSIS AS REQUIRED UNDER THE ATTORNEY GENERAL GUIDELINES.

POINT III

THE PROSECUTOR ABUSED HER DISCRETION IN SEEKING WAIVER BY FAILING TO ADDRESS THE FACTORS SET FORTH IN THE WAIVER STATUTE N.J.S.A. 2A:4A-26.1.

POINT IV

THE JUDGE ABUSED HIS DISCRETION IN WAIVING THE JUVENILE, FINDING THE PROSECUTOR HAD NOT ABUSED HER DISCRETION IN CONSIDERING WAIVER, BECAUSE HE FAILED TO REVIEW THE EVIDENCE PRESENTED AND ADMITTED WHICH APPLIED DIRECTLY TO THE ANALYSIS OF FACTORS CONTAINED IN N.J.S.A. 2A:4A-26.1.

In his supplemental merits brief, Z.S. further argued:

SUPPLEMENTAL POINT I

THE FAMILY COURT'S DENIAL OF DEFENSE COUNSEL'S ADJOURNMENT REQUEST, JOINED BY THE GUARDIAN AD LITEM AND NOT OBJECTED TO BY THE STATE, WHERE

COUNSEL WAS SUFFERING FROM PNEUMONIA AND TACHYCARDIA AND HAD ONLY RECEIVED THE STATE'S SUPPLEMENTAL STATEMENT OF REASONS ONE DAY PRIOR TO THE WAIVER HEARING, DEPRIVED Z.S. OF DUE PROCESS. THEREFORE, THE DECISION GRANTING WAIVER MUST BE REVERSED AND THE MATTER REMANDED FOR AN EVIDENTIARY HEARING BEFORE A DIFFERENT JUDGE. U.S. CONST. AMEND XIV; N.J. CONST. ART. I, ¶ 1.

A. The Lower Court Denied Defense Counsel's Legitimate and Compelling Request for An Adjournment Despite Counsel's Suffering from Double Pneumonia and Tachycardia.

B. The State's Untimely Supplemental Statement of Reasons, Received by Defense Counsel One Day Prior To The Waiver Hearing, Deprived Z.S. of Due Process of Law.

SUPPLEMENTAL POINT II

THE WAIVER DECISION MUST BE REVERSED BECAUSE THE COURT FAILED TO CONSIDER THE UNDISPUTED BRAIN SCIENCE IMPLICIT IN SEVERAL FACTORS CONTAINED IN N.J.S.A. 2A:4A-26.1(c)(3), INCLUDING THAT THE JUVENILE IS DEVELOPMENTALLY DISABLED, HAS A CHRONOLOGICAL AGE OF 17, AND IS FUNCTIONING AT THE INTELLECTUAL (COGNITIVE) LEVEL OF A 13 YEAR OLD CHILD. FURTHER, IN ITS INITIAL STATEMENT OF REASONS THE STATE ABUSED ITS DISCRETION

34

BY RELYNG UPON A MERE CONCLUSORY DETERRENCE ANALYSIS WHICH HAS BEEN COMPLETELY DEBUNKED BY EXPERTS.

    A.    Z.S. is Functioning at a 13-Year-Old Cognitive Level, Therefore a Comprehensive Analysis was Critical.

    B.    The State Did Not Conduct an Individualized Assessment of Deterrence, but Merely Utilized Conclusory Language and Failed to Consider Research Studies.

SUPPLEMENTAL POINT III

WAIVING A JUVENILE TO ADULT COURT WHO MAY NOT BE COMPETENT, IS DEVELOPMENTALLY DISABLED AND FUNCTIONING COGNITIVELY AS A 13-YEAR-OLD, WITHOUT AN EVIDENTIARY HEARING, CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT. U.S. CONST. AMEND VIII, XIV; N.J. CONST. ART. I, ¶ 12; N.J. CONST. ART. I, ¶ 1.

In his reply brief responding to the amicus Attorney General, Z.S.

further argues:

REPLY POINT I

A REMAND FOR AN EVIDENTIARY HEARING WOULD NOT BE "FUTILE" OR "IRRELEVANT" AS ARGUED BY AMICUS, THE ATTORNEY GENERAL OF NEW JERSEY.

REPLY POINT II

THE JUVENILE WAIVER STATUTE, N.J.S.A 2A:4A-26.1, MUST BE READ IN PARI MATERIA WITH THE JUVENILE DEVELOPMENTAL DISABLITY STATUTORY SCHEME, SET FORTH IN N.J.S.A. 2A:4A-43b.

REPLY POINT III

THE PROSECUTOR ABUSED HIS DISCRETION IN MOVING TO WAIVE THE JUVENILE TO ADULT COURT, WHICH WAS RUBBER STAMPED BY [THE FAMILY COURT]. THE PROSECUTOR'S INITIAL STATEMENT OF REASONS AND SUPPLEMENTAL STATEMENT OF REASONS WERE CLEARLY UNSATISFACTORY.

The ACLU as amicus generally supports and amplifies these defense arguments. The Rutgers amici also support Z.S., particularly urging that he was denied due process when the court declined to adjourn the waiver hearing.

Meanwhile, the Attorney General and the State contend in opposition that the waiver determination should be upheld because the prosecutor's decision was not a clear abuse of discretion. The Attorney General takes no position, however, concerning Z.S.'s appeal of the trial court's denial of his counsel's adjournment request.

### III.

We first address the critical issue of the sufficiency of the prosecutor's written reasons justifying Z.S.'s waiver to the Criminal Part.

A. Guiding Principles

As the Supreme Court has made clear, the State has an "affirmative obligation to show that it assessed all the [statutory] factors" concerning waiver, and the court must review this assessment. N.H., 226 N.J. at 251; N.J.S.A. 2A:4A–26.1(b). The State must provide such a written assessment at the time of its waiver motion, laying out the facts it relied on to assess the eleven statutory factors, "together with an explanation as to how evaluation of those facts support waiver for each particular juvenile." N.J.S.A. 2A:4A–26.1(a) (emphasis added).

When evaluating whether the State discharged its obligations to consider all of the statutory factors and the circumstances fully and not arbitrarily, the sufficiency of the prosecutor's written statement of reasons is vital. "The statement of reasons should apply the factors to the individual juvenile and not simply mirror the statutory language in a cursory fashion." N.H., 226 N.J. at 250.

A fundamental aspect of the statutory procedure is that the prosecutor's reasons for seeking waiver must be expressed in written form, with fair notice to the opposing side. The juvenile's attorney must not be forced to guess why the prosecutor believes a particular factor does or does not apply, and why that

A-3516-19T1

factor is comparatively strong, neutral, or weak. The defense lawyer, and the juvenile himself, must be informed about why this momentous decision to waive is being pursued. A fulsome explanation will enable the defense to prepare to counter it, possibly with additional mitigating evidence about the circumstances of the offense or about the juvenile's personal characteristics. Upon learning the prosecutor's reasoning, the defense may seek further mitigating opinions from experts, as well as records of medical or mental health treatment, or additional documents from schools or governmental agencies.

The statement of reasons cannot be incomplete or superficial. Conclusory assertions that are devoid of analysis are inadequate. To use a metaphor from what a math teacher may tell her students, the prosecutor must "show the work." We comparably expect the same in our system of justice from expert witnesses, who are forbidden from spouting net opinions that do not explain the underlying "why[s] and wherefore[s]" of their analysis. Townsend v. Pierre, 221 N.J. 36, 54 (2015).

Similarly, our case law has required a reasonable level of detailed factor-by-factor analysis in prosecutor's letters rejecting an applicant for pretrial intervention ("PTI"). State v. Roseman, 221 N.J. 611, 627 (2015)

(disapproving of a PTI rejection that "merely parroted" the statutory language and presented "bare assertions"); see also State v. Wallace, 146 N.J. 576, 584 (1996).  Here, the consequences are far greater, as this juvenile faces a sentence of a minimum of twenty-five years if found guilty of first-degree aggravated sexual assault and up to life in prison.  We would expect the level of detail in the prosecutor's statement of reasons to be comparable, at the very least, to the detail expected in a prosecutor's statement of reasons for denying a defendant's application for PTI.

Nor should the statement of reasons ignore or gloss over highly relevant information.  If, for example, the defense attorney has presented evidence under factor (j) that the juvenile has mental health concerns, substance abuse problems, or emotional instability, it will not suffice for the statement of reasons to say, without further explanation, that such evidence was "considered" but doesn't matter.  The written statement must reasonably address the content of the defense material and explain why it is flawed, inadequately supported, internally contradictory, or otherwise unpersuasive.

This is not to say that prosecutor waiver statements must emulate Victorian novels or academic tomes.  They need not elaborate about minutiae. And, because positive and negative factors will often exist, the prosecutor's

ultimate conclusion balancing those offsetting factors may not be amenable to precise articulation.

No one factor, however, may be treated as dispositive—such as the severity of the charged offense. If that were so, the Legislature could have categorically declared the offense to be an automatic waiver, and thereby obviated the need for a hearing. See N.J.S.A. 2A:4A-26.1(c)(2) (enumerating a litany of offenses for which waiver may be granted or denied because of mitigating factors, including such extremely serious offenses as homicide, sexual assault, and kidnapping). The Legislature could have also identified factors among the eleven to carry more weight, or presumptive weight. It did not do so. Although all eleven factors may not exist or have equal importance in a given case, they must all be considered with a reasonable amount of attention and explication when they are present.

B. The Prosecutor's First Statement of Reasons and Its Flawed Checklist

The State's first written Statement of Reasons was issued in August 2019 along with the motion for waiver. The format of the Statement did not track the eleven factors listed in the 2016 revised statute. Instead, the Statement was generally organized by a point-by-point application and discussion of the old categories set forth in the 2000 AG Guidelines, followed by a cursory

40

"checklist" that mixes in factors appearing in both the Guidelines and the 2016 revised statute.

The Statement began with a detailed description of the investigation leading to Z.S.'s arrest, including relevant information from the interviews with Z.S. and the victim.

The Statement followed with a brief section noting that Z.S. had no previous juvenile record or contact with the court system.

The next section described the comparable sentences Z.S. would receive in the Family Part and the Criminal Part. If convicted of first-degree aggravated sexual assault in the Criminal Part, Z.S. faced a maximum of life in prison and a minimum custodial term of twenty-five years before becoming parole eligible. He also faced a maximum of five years if convicted of third-degree endangering the welfare of a child, which would likely be merged in the first count. His total expected sentence, if found guilty, would be twenty-five years to life.

The Statement emphasized the possibility of Z.S. serving little, if any, time if the case remained in the Family Part. It asserted the maximum sentences for non-homicide first-degree and third-degree offenses in the Family Part are four and two years, respectively, and he could be expected to

A-3516-19T1

receive a maximum of six years. The prosecution emphasized that juveniles are "immediately eligible for parole" under N.J.S.A. 30:4-123.51(f) and that it expected Z.S. "will likely be released to parole upon reaching his judicial restriction date," which would be roughly one-third of his sentence. It added that he could also be released earlier. Finally, the Statement noted that even if Z.S. were sentenced to a custodial term, he would be eligible for "reassignment to a residential non-secure facility under a probationary term, rather than a custodial term."

The next section of the Statement considered the need for deterrence. The prosecutor asserted that transferring Z.S. to the Criminal Part would deter others from violating the law because the lengthy sentence and period of parole ineligibility "will convey the certainty of serious, enhanced penalties to the community" and deter people from committing similar acts. The prosecutor conceded that Z.S. had no prior offense record but found that a transfer to the Criminal Part "would deter and prevent him from engaging in future crimes" and "ensure that he remains unable to commit further crimes against children during the mandatory period of incarceration."

The Statement then presented a section on "Applicable and Inapplicable Factors." This consisted of a checklist of twenty-three factors, grouped in the

following main sections: nature of the offense; deterrence; effect on co-defendants; maximum sentence and length of time served; prior record; trial considerations; victim's input; and history of juvenile.

The "history of juvenile" portion of the checklist lumped together subparts for: "age and maturity of the juvenile" (thereby addressing the applicability of factor (d) of the 2016 statute); eligibility for special education (as in factor (e) of the new statute); "current or prior involvement" with child welfare agencies (as in factor (i)); and "evidence of mental health concerns, substance abuse, or emotional instability," to the extent provided (as in factor (j)).

The "Nature of the Offense" portion of the checklist includes sub-items for, among other things, an "offense against a person" (tying to factor (b) of the 2016 statute); "degree of the juvenile's culpability" (tying to statutory factor (c)); and "degree of criminal sophistication exhibited by the juvenile" (tying to statutory factor (f)). Other sub-items are presented that are not listed in the statute. The "victim's input" (which ties in with factor (k) of the statute), is given its own category, and marked with an "A" for applicable.

Where a factor was "applicable" it was simply noted with an "A;" inapplicable factors were noted with an "I." Eleven factors were deemed "inapplicable," and twelve were deemed "applicable."

Critically, the checklist portion of the Statement contained no analysis, but simply a column of "A's" and "I's." For example, the "degree of criminal sophistication" sub-item is designated with an "A," without any discussion of how or why that applies as a pro-waiver factor to Z.S., whose has diagnosed intellectual disabilities and mental health disorders. Nor does the checklist explain why "A" is checked for Z.S.'s age and maturity.[11]

At the end of the checklist, the Statement declares: "The applicable factors outweigh the inapplicable factors: <u>Yes</u>." The Statement makes no effort to explain how or why. One also cannot tell the meaning of whether a factor is "Inapplicable". For instance, does the "I" mean the factor (such as a prior offense record or gang involvement) is not present at all? Or does an "I" signify that the item may be present (such as emotional instability), but that the

---

[11] We recognize Z.S.'s age was nearly eighteen at the time of the charged acts, but his maturity is not clear in light of Dr. Bogacki's uncontested finding of an intellectual age of thirteen-and-a-half. On appeal, the prosecutor advised us during oral argument that his office accepts as true this expert estimate of Z.S.'s intellectual age, but he reminds us the statute speaks in terms of a juvenile's chronological age. We need not resolve here the legal significance of "intellectual age," or the multiple ways it can be computed.

prosecutor didn't think it was meaningful or weighty? The form used by the prosecutor does not explain this.

The final passage of the Statement concludes that "Based on the serious nature of the charges against [Z.S.]," the State moves to have jurisdiction transferred from the Family Part to the Criminal Part. We may surmise from this conclusion that the "serious nature of the charges" played a crucial, perhaps dispositive, role in the State's analysis. However, the Statement does not explain how according that factor such pre-emptive weight comports with the revised 2016 statute, which makes the "nature and circumstances of the offense" only one of eleven enumerated factors. See N.J.S.A. 2A:4A-26.1(c)(3)(a).[12]

C. The Prosecutor's Terse Supplemental Letter

After receiving the mitigating materials from Z.S.'s counsel, the State submitted a two-page letter in lieu of a formal addendum to its statement of reasons dated February 17, 2020. The letter stated that, in light of the consideration of the above materials and DCPP records, it determined that

---

[12] We are cognizant that the severity of the charged offense may often be, quite logically, a very weighty consideration in favor of waiver, particularly if the mitigating factors are weak or non-existent. Our point is that a prosecutor must explain why it regards the other factors as paltry by comparison. Again, the prosecution must "show its work."

three new statutory factors were now applicable, specifically: statutory factor (e), any classification for special education eligibility; factor (i), current or prior involvement of the juvenile with child welfare agencies; and (j) "[e]vidence of mental health concerns, substance abuse, or emotional instability of the juvenile." See N.J.S.A. 2A:4A-26.1(c)(3)(e), (i), (j). These factors had previously been deemed "inapplicable" in the initial Statement of Reasons. The prosecution also determined that the information was newly "applicable" to factor (c), Z.S.'s culpability, although it did not explain how much it affected the culpability assessment, or in what way. N.J.S.A. 2A:4A-26.1(c)(3)(c).

The State "[s]pecifically" took into account Z.S.'s prior medical diagnoses. "Most importantly," it "heavily considered" the evidence from the DCPP records that Z.S. was also sexually assaulted as a young child. Although the prosecution considered this information as it relates to the statutory factors, it "continue[d] to seek waiver as the factors in favor of waiver continue to outweigh those against."

D. Oral Argument at the Waiver Hearing

During the oral argument at the hearing, the assistant prosecutor told the judge that this was the first waiver application that her office had presented

since the statute had been revised in 2016. Consequently, the prosecutor was unsure (as was defense counsel) about what mitigating reports and documents the court would admit into evidence and consider. As she explained it, the assistant prosecutor "did save a lot of the factual analysis for oral argument." The assistant prosecutor had also hoped to have a pre-hearing conference with Z.S.'s attorney to review the exhibits, but her adversary had been ill.

The trial court excused this omission, finding a "good faith basis" for the prosecutor to have addressed the defense reports at a "late hour." The court noted this case had "a special history," citing the lack of cooperation by Z.S.'s mother, which delayed defense counsel's ability to obtain the mitigating records sooner. The court declined to find fault on the part of either side for the last-minute discussion but suggested that it might not be the norm for future cases in the vicinage. The court further observed that "both counsel have done a very good job certainly verbally, going over their respective positions."

The prosecutor assured the court that her office had duly considered the mental health reports and other materials supplied by the defense. She conceded that they did make applicable several factors that were originally deemed inapplicable. And she also acknowledged that the materials "added to the analysis" of Z.S.'s culpability, albeit without explaining how much they

mitigated that assessment. The prosecutor added a caveat that she was "willing to stipulate that these are the records [she] received," but could not stipulate that "the findings are accurate and appropriate."

Despite her illness, Z.S.'s attorney forcefully argued to the court that the mitigating reports outweighed the factors supporting waiver. She did not call any of the experts to the stand. She urged that the prosecutor's decision to pursue waiver, despite her client's mental health and disability issues, was a clear abuse of discretion.

As we have noted, the court then issued an oral decision, finding the prosecutor had not clearly abused her discretion. The court ruled that the prosecutor's written submissions "meet the statutory criteria." The court found the submissions "clearly demonstrate" the prosecutor considered the appropriate factors that were known initially. Thereafter, the prosecutor "did make pause" in later considering Z.S.'s IEP and the other supplementary materials provided by the defense. The court recognized Dr. Bogacki's expert opinion that Z.S. has mental health challenges and the intellectual capacity of a thirteen-year-old. Even so, the court was satisfied the prosecutor took this mitigating information into account when considering the "totality of

circumstances," including Z.S.'s apparent evasiveness when he was interviewed.

E. <u>Analysis</u>

Having reviewed this procedural history in light of the applicable law, we conclude that the prosecutor's written Statement of Reasons and the cursory supplemental letter were materially deficient. Those submissions fell short of the critical requirements of written analysis demanded under the statute and the case law.

In reaching this conclusion, we acknowledge that, as counsel have represented, this was the first waiver application this county prosecutor's office had presented since the Legislature repealed N.J.S.A. 2A:4A-26 in 2016 and replaced it with N.J.S.A. 2A:4A-26.1. According to the Attorney General, the form of the Statement of Reasons the prosecutor used in this case, including its Applicable/Inapplicable checklist, is not used by any other county. It appears the prosecutor improvised the form.

To some extent, the prosecutor might have been led astray by the lack of revision of the 2000 AG Guidelines. Those Guidelines are obsolete, in that they omit several factors added by the 2016 revision while retaining considerations, such as deterrence, that are not listed as full-fledged factors in

the newer law. We urge the Attorney General to expeditiously withdraw the old Guidelines and replace them with new Guidelines that track the eleven factors adopted in 2016.

The Applicable/Inapplicable checklist supplied by the prosecutor was woefully inadequate and largely uninformative. A proper statement of reasons must contain explanatory discussion that was lacking here. The prosecution did not sufficiently reveal its reasoning.

Moreover, the checklist's organization gave subsidiary status to some subjects that are full-fledged factors under the 2016 statute, while exalting other subjects the Legislature did not identify as factors. To be sure, we recognize that the waiver analysis is not a counting exercise. Some factors can have more importance or probative strength than others. Because this is not a mechanical quantitative process, it is all-the-more vital that the statement of reasons be qualitatively sufficient. That did not occur here.

The prosecutor's supplemental letter likewise fell short of the mark. With the exception of the DCPP records showing that Z.S. had been sexually abused as a minor, the letter was bereft of any meaningful discussion of the expert reports of Dr. Oasin, Dr. Bogacki, and Dr. Slaughter. Nor did the letter explain why the Social Security Administration's finding of intellectual

disability is inconsequential, despite case law that makes such findings prima facie rebuttable proof of disability in Family Part proceedings. See Golian v. Golian, 344 N.J. Super. 337, 342-43 (App. Div. 2001); see also Gormley v. Gormley, 462 N.J. Super. 433 (App. Div. 2019) (reiterating the holding of Golian). The letter also does not explain why Z.S.'s special education status and IEP plan are immaterial or insignificant. As we have said, it is not enough for a prosecutor to declare in conclusory fashion they were considered.

The combined effect of the prosecutor's idiosyncratic Statement of Reasons format and the brevity of its supplemental letter was to dwell upon the characteristics of the charged offense and give little attention to the characteristics of this juvenile offender. This skewed method, nearly approaching a categorical approach based on the seriousness of the charges, was unfair to Z.S. It was also inconsistent with the statutory scheme.

The factors adopted under the 2016 statute treat both the characteristics of the offense and the offender as important to the waiver analysis. The prosecutor's submissions here said much about the former but gave short shrift to the latter. That was unacceptable.

The prosecutor's attempt at the waiver hearing to cover omitted ground orally did not cure the problem. We accept the judge's finding that neither side

was at fault for the last-minute exchange. But the statute calls for written, not just oral, statements of reasons. That disclosure gives the defense a fair opportunity to make strategic decisions, such as perhaps obtaining supplemental expert reports that may persuade a prosecutor's office to reconsider its decision to seek waiver, or calling witnesses at the hearing to buttress the defense's position.

Oral argument should not be the first time the defense learns of the prosecutor's reasons, particularly in this context that is such a crucial event in the charged minor's life. Adequate written notice is especially important where, as we discuss in Part IV of this opinion, the juvenile's attorney is battling illness and therefore less able to respond spontaneously to the prosecutor's newly presented arguments.

Our decision in State v. Hoffman, 399 N.J. Super. 207 (App. Div. 2008), a PTI case cited by the State, is distinguishable. There we noted shortcomings in a prosecutor's letter rejecting the PTI application of a defendant charged with third and fourth-degree crimes but declined to remand the case because the prosecutor had covered the grounds for rejection amply at the hearing before the trial court. Id. at 217-18. In the present case, the stakes, which could portend a life sentence for Z.S., are far greater. The differences between

a Family Part juvenile case and an adult prosecution for a first-degree crime in the Criminal Part are enormous.

Because of these fundamental deficiencies, the order upholding the waiver of Z.S. must be vacated and the matter remanded for a new hearing. In advance of that hearing, the prosecution must generate a new written Statement of Reasons that tracks, and comments with a reasonable level of explanation, upon each of the eleven factors of N.J.S.A. 2A:4A-26.1. Once that new Statement of Reasons is furnished, counsel for Z.S. may have a reasonable opportunity to generate additional materials and arguments in response.

In the trial court's discretion, the defense may call experts or other witnesses at the hearing that may illuminate the issues. See N.J.S.A. 2A:4A-26.1(b) (noting that at the waiver hearing the trial court "shall receive the evidence offered by the State and by the juvenile"); N.J.S.A. 2A:4A-26.1(e) (noting that "testimony" from the juvenile will not be admissible at subsequent hearings, suggesting that courts may allow certain testimony to be presented at waiver hearings).[13]

---

[13] The Attorney General and the Public Defender each represented to us at oral argument that such evidentiary hearings about the juvenile's characteristics are

This is not to intimate any suggestion as to what the waiver decision in this case ultimately should be. That is a determination entrusted by statute to the prosecutor and can only be set aside by the court upon proof of a clear abuse of discretion. N.J.S.A. 2A:4A-26.1(c)(3). We remand solely because of the critical procedural deficiencies that occurred, and do not reach the merits.

IV.

We briefly turn to a separate and independent basis for vacating the trial court's decision in this case: the denial of the adjournment of the hearing requested, without opposition, by the ill public defender. We need not dwell upon this issue at length, except to note that it is the sole issue briefed by the Rutgers amici, and that the amicus Attorney General (as is its prerogative) has chosen not to address the subject.

At the start of the waiver hearing, Z.S.'s counsel requested a continuance. She recounted for the court that she had recently been hospitalized with pneumonia and was still ill but had been "medically cleared" to return to work that day. Due to her illness, she had been unable to meet with Z.S., his mother, and the guardian ad litem for scheduled meetings to review the case. She also stated that she had just received the prosecutor's

occasionally conducted in some counties on waiver matters, but they are not the norm.

addendum of reasons the day prior and had been unable to review it with Z.S. She advised the court she was "still actively sick and out of breath and not up to my normal standards."

Z.S.'s counsel stated that "to be fair to my client . . . I am 100 percent prepared on this case but as to my normal standard of litigating, I don't think I'm up to par." Although she was "ready to go" she stated that she had hoped to have the week to fully prepare, to meet with Z.S., outline her case, and discuss it with the guardian ad litem.

Counsel stated that her supervising attorney took time to prepare for the case the day before and he would have been present at the hearing but "I have lived and breathed this case since July and I don't think it's appropriate to pass it off to him." Given the gravity of the hearing, she sought a continuance until she was healthy.

The guardian ad litem also objected to proceeding while Z.S.'s counsel was sick, urging that a "minor adjournment is in order." He argued the court was obliged to ensure "there should be adequate time for preparation of the case," analogizing this to the obligation to permit discovery in a waiver hearing.

 A-3516-19T1

The prosecutor stated she did not "have any formal objection to a postponement." However, she noted the victim's family was present in the courtroom, and that the hearing had already been significantly delayed.

The trial court stated it took defense counsel's health concerns seriously and accepted her statements "at face value." However, the court observed that it "is challenged with a balancing of interests." On the one hand was Z.S.'s right to a "speedy trial." The court acknowledged that this right could be waived, suggesting perhaps that it was not immediately in Z.S.'s best interests to proceed, but that he had "these charges hanging over his head and he has a right to have these charges resolved . . . we have to get the ball rolling, so to speak."

In addition, the court noted that there was an alleged victim in the case, and that it had to balance the "interest [of] the victim and the other side," including the risk that the reliability of witness testimony would diminish over time.

Despite the lack of objection to an adjournment, the court concluded it was "beyond the pale to allow any more delay at this point." The charges were first brought in July 2019, and the waiver motion was supposed to be held in October 2019. The court had repeatedly delayed the hearing because Z.S.'s

56

mother had refused to assist his counsel in the case at multiple stages, and it recounted the various efforts made by Z.S.'s counsel for important information that she ultimately obtained. The court noted that it had ordered, reviewed, and released the DCPP case records to the parties in December 2019, and had appointed the guardian ad litem to ensure Z.S. had effective representation when his mother continued to delay the process.

The court recounted that it had scheduled the hearing for the day before, but received an email from Z.S.'s counsel detailing her illness and stating that she "anticipated there was a possibility of being available and cleared by her doctor to be back at work Thursday." The court thereafter "juggle[d] its schedule" and pushed back the hearing based on that expectation. This was significant because "[t]his is the only Family Court [in Salem County] and this Court handles the FJ docket, the FD docket, the Children and Court docket, so finding open time and rearranging the schedule further delays justice," not only for the present parties but for other cases that would have to be delayed to accommodate this one.

The court praised Z.S.'s counsel and her office, observing that her supervisor was ready to take over the hearing if she was unable. The court further stated it "has the utmost confidence in the abilities of the attorneys."

The court noted Z.S. was "entitled to a fair, not a perfect, proceeding" and that under the circumstances it determined that it would not postpone the waiver hearing further.

We review the court's decision by first recognizing that this was no ordinary adjournment request. As the Public Defender, the ACLU and the Rutgers amici have rightly urged, a hearing to determine whether a minor will be prosecuted as an adult is perhaps the most serious proceeding that a minor will ever face. The Supreme Courts of the United States and our State have repeatedly underscored the gravity of such proceedings, and the constitutional Due Process rights attendant to them. Those rights include the right to the effective assistance of counsel. In re Gault, 387 U.S. at 41.

As a general matter, trial courts are granted considerable latitude in scheduling their proceedings. In most instances, we will not interfere with decisions to grant or deny adjournments. We usually will not overturn an adjournment denial unless it represents a misapplication of discretion. See, e.g., State v. Hayes, 205 N.J. 522, 538 (2011). With all due deference to the trial court's operational, speedy trial, and other concerns, the court misapplied its discretion in denying a short postponement to defense counsel here.

The court accepted the truth of the public defender's representations about her medical status, and so do we. She was only released from the hospital for pneumonia and tachycardia two days earlier. Although she had been "medically cleared" to return to work, she reported that she was still feeling ill and was, in fact, having trouble breathing. She asserted that she was "prepared" for the hearing, but also told the court she needed some more time to rebound from her illness and confer with her client about the State's recent letter.[14]

The court was certainly right to consider the previous delays in the case, which apparently were not caused by the prosecution, as well as the interests of the victim's family who were present. Yet the prosecutor, who must be also mindful of the victim's interests, did not oppose a brief delay of the case. Also, it bears mention that the best interests of the juvenile were being assessed and advocated by his own attorney, and that the court should have accepted her position on his behalf.

In hindsight, it would have been better if the court had explored intermediate possibilities. For example, it may have been enough to proceed

---

[14] Preparation does not equate to fitness to endure a rigorous event when one is feeling sick. A law school graduate may have "prepared" for the bar examination by studying all of the subjects for months, but may be too ill on the date of the exam to sit for it.

A-3516-19T1

solely with the playing of the recordings and the direct examination of the detective on probable cause, deferring to another day cross examination by defense counsel as well as her presentation of mitigating evidence and arguments on the statutory factors. On appeal, the Public Defender agreed that such a partial hearing could have been a fair compromise to avoid a wasted court session.

We recognize the transcript does not reveal any clear shortfalls of advocacy by the public defender at the hearing, despite her illness. She asked pointed questions of the detective on cross and presented thoughtful arguments opposing waiver. The court's prediction that she would ably represent her client was essentially borne out. But she and her client should not have been forced to complete the hearing under the circumstances. The denial of the adjournment was improvident and provides a separate reason to remand.

We decline to reach the remaining arguments presented by counsel and the amici, including contentions that the trial court was obligated to consider "youth factors" recognized under the Eighth Amendment in <u>Miller v. Alabama</u>, 567 U.S. 460, 471 (2012), and its progeny, or that it was required to perform a "heightened analysis" of waiver for juveniles with intellectual disabilities. Those institutional legal arguments, which were not raised below, may be

60

renewed in some future appeal of this or another waiver case.  <u>State v. Galicia</u>, 210 N.J. 364, 383 (2012) (noting that appellate courts disfavor reaching issues, even constitutional ones, not raised below).

V.

For these reasons, we vacate the court's waiver determination, without prejudice, and remand for further proceedings consistent with this opinion. The court's unchallenged finding of probable cause is affirmed.

Affirmed in part and remanded in part.  The parties and the court shall have a case management conference within twenty days to plan the remand process.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3516-19T1